

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**June 16, 2022 03:45 PM**
**PAVAN PARIKH**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1201344**

**FIRST STAR LOGISTICS LLC**                    A 2202185

**vs.**
**ERICA CUTHBERTSON**

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 36**

# EXHIBIT A

EFR200

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY OHIO

| | | |
|---|---|---|
| **FIRST STAR LOGISTICS, LLC,** | : | |
| 11461 Northlake Boulevard | : | Case No.: _____ |
| Cincinnati, OH 45249, | : | |
| | : | Judge: _____ |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **Complaint** |
| **ERICA CUTHBERTSON** | : | |
| 6800 Dunmurry Lane | : | (JURY TRIAL DEMANDED) |
| Charlotte, NC 28217-3409 | : | |
| | : | |
| **Please Also Serve At:** | : | |
| c/o Alesha S. Brown, Esq. | : | |
| Justice in Action Law Center | : | |
| 521 Briar Creek Road | : | |
| Charlotte, NC 28205 | : | |
| | : | |
| **Defendant.** | : | |

For its Complaint (the "Complaint") against Erica Cuthbertson ("Defendant"), Plaintiff First Star Logistics, LLC ("First Star") states:

### Introduction

1.     This is a breach of contract action against First Star's former agent, Erica Cuthbertson.  Following her employment with First Star, Defendant began working as an independent freight broker for a First Star competitor, thereby directly violating several restrictive covenants she owed First Star in a Sales Agent Agreement (the "SAA") and a Non-Disclosure and Restrictive Covenant Agreement ("NDA").  The SAA and NDA are collectively referred to herein as the "Agreement".  True and accurate copies of the SAA and NDA are attached to this Complaint as Exhibit 1 and Exhibit 2, respectively, and incorporated herein by reference.

1

2.     First Star employed Defendant to develop business and provide intermodal freight transportation services for First Star in the North Carolina region. Before starting with First Star, Defendant executed the Agreement, pursuant to which she agreed, among other things, to reimburse and pay certain expenses that First Star prepaid during the parties' business relationship, and to be bound by certain restrictive covenants, including a covenant not to compete with First Star during the Agreement's term, a covenant not to solicit First Star's customers or employees for a period of two years following the Agreement's termination (for whatever reason), and a covenant to keep First Star's information confidential and not use it for her own or others' purposes.

3.     On August 29, 2018, the parties executed the SAA, which has an initial term of one year and then automatically renews for one-year periods thereafter unless terminated pursuant to the SAA's terms. When First Star presented the SAA to Defendant for her review and signature, the SAA had attached (as "Exhibit A") and incorporated by reference an Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment. On November 10, 2018, Defendant executed the NDA.

4.     Defendant's employment with First Star ended on or about March 20, 2020. First Star discovered through separate litigation that, following her time developing business for First Star, Defendant proceeded to work for a competing freight brokerage for a period of two weeks before subsequently engaging in independent freight brokerage—in direct violation of the Agreement, which prohibits competition with First Star for a period of two years after Defendant's status as a First Star agent ends.

5.     Upon information and belief, Defendant also violated the Agreement by soliciting First Star's customers and other agents using a pseudonym, "Erica Anthony."

6.      By working for or assisting a First Star competitor, and also brokering freight independently, Defendant violated her covenant to provide exclusive freight brokerage services to First Star.

## The Parties

7.      Plaintiff First Star is a Delaware limited liability company that is registered with the Ohio Secretary of State to conduct business in Ohio and currently has its headquarters at 11461 Northlake Boulevard, Cincinnati, Ohio 45249.  First Star is a federally registered freight broker that provides third-party logistics services throughout the United States.

8.      Upon information and belief, Defendant resides at 6800 Dunmurry Lane, Charlotte, North Carolina.

## Jurisdiction and Venue

9.      This Court has original jurisdiction over this action.

10.     This Court has personal jurisdiction over Defendant because, among other reasons, First Star's causes of action arise from her breaches of the Agreement.  Defendant submitted to this Court's jurisdiction when she executed the Agreement in Ohio.

11.     Venue is proper in this Court with respect to Defendant since she contractually agreed to designate Hamilton County, Ohio, as the exclusive venue for disputes arising from the Agreement.

## The Facts

A.      *The Nature of First Star's business.*

12.     First Star is a federally registered freight broker that provides third-party logistics services throughout the United States, including, without limitation, intermodal marketing,

3

international air and ocean transportation, freight forwarding, and a broad array of other transportation needs.

13.     First Star regularly partners with independent contractors to expand its logistics and freight network nationally to better serve its existing customers.  To do so, First Star engages independent contractors as agents throughout the U.S. to perform services for existing First Star customers in a local market and to develop additional business.

14.     These contractors, typically referred to as "agents," operate under the First Star name and hold themselves out to the public and to customers as being part of First Star while providing services to existing First Star customers and developing business.

15.     First Star assists its agents in building their network and business in their geographical markets and often refers local business from First Star's customers to its agents within the region where the services are required.  In other words, First Star regularly provides business for its agents.

16.     The third-party logistics industry (and the shipping industry at large) is extremely fragmented and competitive.  As such, developing and maintaining relationships with agents, customers, and carriers is critical to achieving and maintaining success in the industry.

17.     Conditioned upon signing  the Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, First Star grants its agents access to certain types of confidential and proprietary information, including, without limitation, detailed customer lists and related information, proprietary company processes and techniques, and other sensitive types of information.

4

18.     Access to this information is essential for these agents to service First Star customers and to develop business in the local market—both from existing First Star customers and other companies.

19.     First Star has spent a great deal of time, money, and other resources developing and maintaining this confidential and proprietary information, developing relationships with new customers, and strengthening relationships with existing ones.

20.     First Star has also expended significant resources (financial and otherwise) to develop its sales and marketing processes and training for its agents to best set them up for success.

21.     First Star has taken several steps to protect its relationships with current and prospective customers, as well as its confidential, proprietary, and trade secret information.  For instance, First Star keeps secure password controls on all its proprietary information and restricts access, even among its agents, to registered users who must be vetted and approved by First Star before receiving access.

22.     First Star also requires its sales and trucking agents to sign agreements that create certain non-competition, non-solicitation, and non-disclosure covenants.

B.      *Defendant begins working as a First Star agent.*

23.     On August 29, 2018, Defendant executed the SAA with First Star and began working as an independent contractor.  Subsequently, Defendant executed the NDA when she became a First Star employee on November 12, 2018.  Defendant continued to provide services to First Star until both agreements were terminated on or about March 20, 2020.

24.     Under the SAA, Defendant's role and responsibilities with First Star differed from her role and responsibilities as an employee.  Under the SAA, she developed business brokering freight and received a commission.  As a salaried employee, Defendant was responsible for

recruiting agents for First Star's trucking division, QFS Transportation, LLC ("QFS"). As an additional financial incentive, she received a portion of any commission generated by agents whom she recruited.

25.     Per its terms, the SAA's initial term was one year—from August 29, 2018 to August 29, 2019—which automatically renewed for successive one-year terms unless either party provided written notice of non-renewal at least thirty days prior to the end of the then-existing term. *See* Ex. 1, Agreement, SAA at Art. VI, § 6.1.

26.     Under the SAA, Defendant became an independent contractor working under First Star's banner during the Agreement's term. *See id.*, at Art. I, § 1.1.

27.     After executing the SAA, First Star provided Defendant, as a First Star agent, with access to certain confidential and proprietary information of First Star, including, without limitation, existing and prospective customer lists (including preferred points of contact and other customer-specific information), sales processes, sales history, and procedures.

28.     First Star paid for and provided a litany of services to Defendant. First Star spent additional and excessive sums on other items for Defendant's business once the SAA was executed. All these charges were essential for Defendant to become and successfully operate as a First Star agent, and for Defendant to be able to broker any freight at all, and the charges were communicated to Defendant as First Star accrued them.

29.     To protect First Star's investment and encourage it to freely share its confidential information with Defendant, the SAA provides confidentiality, non-solicitation, and non-competition protections for First Star.

30.     The SAA states, in pertinent part:

"[Defendant] agrees that during the term of the Sales Agent Agreement, **and for a period of 365 days following the termination of Sales Agent Agreement for any**

6

**reason**, [Defendant] (including [her] owners, employees, officers, directors, and representatives) **will not**, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of [First Star], **solicit business, or attempt to solicit business, in products or services competitive with products or services sold by [First Star], from any Customer of [First Star].**"

*See id.*, at Exhibit A to Exhibit 1, Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, § B(1) (emphasis added).

31. Furthermore, Defendant agreed not to disclose any of First Star's confidential information and agreed that she would "take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and agrees to immediately notify [First Star] if there is any unauthorized use or disclosure of the Confidential Information." *See id.* at § A(3).

32. Similarly, the NDA states, in pertinent part:

"[Defendant] covenants and agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, that, without the express prior written permission of [First Star], [Defendant] will not directly or indirectly, either as principal, agent, employee, stockholder or co-partner or in any other individual or representative capacity, or in any relation whatsoever:

   i. Solicit, divert or take away or attempt to solicit, divert or take away, any of the Customers, Prospective Customers, agents, brokers, carriers, or employees of [First Star];
   ii. Attempt to seek or cause any Customers, agents, brokers, carriers, or employees of [First Star] to refrain from continuing their relationship with [First Star];
   iii. Knowingly solicit employment from, or a contractual relationship with, [First Star's] agents, brokers, carriers, or employees; or
   iv. Be employed by, perform services for, or receive compensation from, any individual or entity who competes with [First Star]."

*See NDA, Exhibit 2, at § 6.*

33. The SAA also provided that Defendant would indemnify First Star for "all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense" that resulted from Defendant "(i) breaching any provision of this Agreement, (ii) making

representations or statements not specifically authorized by [First Star] herein or otherwise in writing, (iii) marketing, selling, or providing Services to customers other than as expressly authorized in this Agreement, (iv) violating any applicable law, rule, regulation, ordinance or order, or (v) any other negligent acts or omissions or contractual breaches." *See* SAA, Exhibit 1, at § 5.1(a).

34.     These provisions are only some of the safeguards First Star implemented to protect its confidential and proprietary information. In addition to requiring all its agents and employees to enter restrictive covenants, First Star also restricts the use and distribution of computer passwords that allow access to its database, which houses several types of confidential customer and other information.

35.     Finally, both the SAA and NDA provided that they would be governed by Ohio law, and that any dispute arising from them would be resolved in the courts of Hamilton County, Ohio. *See* Exhibit 1 (SAA) at Art. VII, 7.6; Exhibit A to Exhibit 1(SAA) at § C(4); Exhibit 2 (NDA) at § 9(a).

> D.     *Defendant Competes with First Star in Direct Violation of the Agreement*

36.     Defendant's employment with First Star ended on or about March 20, 2020.

37.     Upon information and belief, following her departure from First Star but still during the Agreement's term, Defendant began brokering freight as an independent freight broker and later for Solvent Logistics, a First Star competitor.

38.     Upon information and belief, Defendant attempted to conceal her illegal activity by using a pseudonym, "Erica Anthony," to solicit First Star customers and employees, in violation of the Agreement.

8

## COUNT ONE: BREACH OF CONTRACT

39.     First Star restates and realleges the preceding paragraphs of this Complaint by reference.

40.     The Agreement is a valid and legally enforceable contract that both First Star and Defendant entered into freely and without duress.

41.     In exchange for her commitment to be bound by the SAA and NDA, Defendant received adequate and sufficient consideration, including, without limitation, compensation, training, First Star's payment of various onboarding expenses, and access to First Star's confidential and proprietary information to help with Defendant's professional development and to successfully perform her contractual duties to First Star.

42.     The Agreement is both reasonable in scope and reasonably tailored to protect First Star's legitimate business interests.

43.     Upon information and belief, Defendant breached the Agreement by: (1) providing logistics and related services in direct competition with First Star during the Agreement's term; (2) soliciting First Star customers and agents; (3) otherwise diverting business away from First Star through disparaging or defamatory remarks about First Star.

44.     As a direct and proximate result of Defendant's actions, First Star has suffered damages in an amount to be determined at trial, but believed to exceed $25,000.

45.     As a direct and proximate result of Defendant's actions, First Star has incurred attorney's fees and other expenses in an amount to be determined at trial and for which Defendant is liable to indemnify First Star.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff First Star Logistics, LLC respectfully requests that this Court issue a judgment as follows:

a) On Count One, award damages in favor of First Star and against Defendant, in an amount to be determined at trial in excess of $25,000.00, plus costs, attorneys' fees, and pre- and post-judgment interest; and

b) Any other relief the Court deems just and proper.

Respectfully Submitted,

*/s/ Charles B. Galvin*
Charles B. Galvin (0091138)
FROST BROWN TODD LLC
9277 Centre Pointe Drive, Suite 300
West Chester, Ohio 45069
Phone: (513) 870-8242
Facsimile: (513) 870-0999
cgalvin@fbtlaw.com

J. Maxwell Williams (0099007)
Simon Y. Svirnovskiy (0097096)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Phone: (513) 651-6800
Facsimile: (513) 651-6981
mwilliams@fbtlaw.com
ssvirnovskiy@fbtlaw.com

***Trial Attorneys for Plaintiffs***

### JURY DEMAND

Plaintiff First Star Logistics, LLC demands a trial by jury on all matters to which it is entitled.

/s/ Charles B. Galvin
Charles Galvin (0091138)

0130771.0750160   4883-4286-7236v2
6/15/2022 4:06 pm

11

**EXHIBIT 1**

## SALES AGENT AGREEMENT

THIS SALES AGENT AGREEMENT (this "Agreement") is made as of _Aug 24_, 201_9_ by and between **First Star Logistics LLC**, a Delaware limited liability company that is registered to do business in, Ohio and other states, or any successor in interest thereto (the "Company"), and _Erica Cuthbert_ whose address is _9302 S Vicksburg Park Ct_, (the "Agent"). The Company and Agent are each a "Party" and together are "Parties" to this Agreement.

_Charlotte NC 28210_

### RECITALS

A. The Company is a third-party logistics business that provides and manages motor carrier brokerage services, intermodal marketing services, international air and ocean services, freight forwarding services, warehousing, supply chain management services, and a broad range of other transportation services, including, without limitation, the leasing, allocation and interchange of intermodal equipment (the "Business"); and

B. The Company desires to engage Agent to sell the products and services included in the Business to customers and provide other services in furtherance of the Business in accordance with this Agreement's terms and conditions.

C. Agent desires to actively and diligently promote the Business and sell such products and services and provide such other services, all in accordance with this Agreement's terms and conditions.

### AGREEMENT

NOW, THEREFORE, in consideration of this Agreement's mutual covenants and agreements, and the mutual benefits to be derived hereunder, the Parties, intending to be legally bound, hereby covenant and agree:

### ARTICLE I
### APPOINTMENT AND SCOPE

1.1 Appointment. Subject to this Agreement's terms and conditions and for this Agreement's Term (as defined in Article VI below), the Company hereby appoints Agent as a non-exclusive independent agent to market, sell, and provide Services (as defined below) and to provide certain services in furtherance of the Business in accordance with this Agreement. Agent hereby accepts such appointment subject to this Agreement's terms and conditions and agrees to use its best commercially-reasonable efforts to advance and expand the Business. For purposes of this Agreement, "Services" means transportation management and/or supply chain management, arranging and contracting for freight, transportation, and warehousing services, freight routing, logistics services and consulting, fleet management, scheduling and tracing services, leasing of intermodal equipment, customer and customer support services and other services in furtherance of the Business as the Company may request for its benefit. Agent further acknowledges and agrees that it will not take actions, or fail to act, in a way likely to harm the Business including, without limitation, directing business away from the Company.

1.2 Independent Contractor Status.

(a) This Agreement does not constitute an association, general agency, partnership or joint venture. Except for soliciting orders and providing Services in accordance with this Agreement's provisions, Agent is not vested with any authority to bind the Company and shall not be considered an agent or legal representative of the Company for any purpose. Except as expressly provided herein, Agent is not granted and shall not exercise the right or authority to assume or create any obligation or responsibility, including, without limitation, contractual

obligations and obligations based on warranties or guarantees, on the Company's behalf of or in its name. Agent shall not misrepresent its authority to any third party and shall avoid giving the appearance of having authority to bind the Company other than as provided in and consistent with this Agreement. Agent agrees to clarify this limitation of authority in response to any inquiry by the Company's existing or prospective customers or any other third party.

(b) Neither Agent nor any agent, employee, or representative of Agent shall be, or shall be considered, a Company employee. Agent's relationship with the Company shall be that of an independent contractor, and as such, except as expressly set forth in this Agreement, the Company shall not have control, and Agent shall have exclusive control, over Agent's means and methods of performing the Services, including, when, where, and how Agent sells, markets, or provides the Services or performs its other obligations under this Agreement.

## ARTICLE II
## AGENT'S REPRESENTATIONS AND WARRANTIES

Agent hereby represents and warrants to the Company:

2.1 Authority and Enforceability. Agent is duly authorized to enter into this Agreement, and this Agreement is valid, binding and enforceable against Agent in accordance with its terms.

2.2 Consents; Conflicts.

(a) Agent has obtained all governmental and third party consents and approvals required for Agent to enter into this Agreement and perform in accordance with its terms and conditions and to sell, market, and perform the Services.

(b) Agent is not bound by the terms of any agreement with any previous employer or other party to refrain from (i) using or disclosing any trade secret or confidential or proprietary information in the course of marketing, selling, or performing Services or performing its other obligations under this Agreement or (ii) competing, directly or indirectly, with the business of such previous employer or any other party. If so, Agent will immediately notify the Company of such an agreement and provide a copy to the Company. The Company reserves the right to terminate this Agreement if Agent fails to disclose any such agreement. This Agreement and Agent's sales, marketing, and performance of the Services and performance of its other obligations under this Agreement do not, and will not, breach any agreement to keep in confidence proprietary information, knowledge or data acquired by Agent in confidence or in trust before the Company's engaged Agent. Agent will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or any other party.

2.3 No Inducement to Breach Contracts with Others. The Company has not encouraged or induced Agent to breach or violate the terms of any contract or agreement, whether oral or written, to which Agent is a party or otherwise bound or subject.

2.4 Permits; Compliance with Laws.

(a) Agent possesses, and will maintain during this Agreement's Term, all required licenses, approvals, consents, permits, and certifications necessary for Agent to perform its obligations under this Agreement.

(b) Agent has not violated any applicable law, rule, regulation, or ordinance, whether federal, state, or local. Agent will not violate any applicable law, rule, regulation, or ordinance, whether federal, state or local while performing its obligations under this Agreement.

## ARTICLE III
## AGENT'S RIGHTS, OBLIGATIONS AND COVENANTS

2

3.1 Operations and Expenses.

(a) *Agent's Control.* Agent's performance of the Services is subject to its sole control and management.

(b) *Agent's Liability for Expenses.* Except as expressly provided in this Agreement, Agent shall be responsible and liable for its costs and expenses of selling, marketing, and providing the Services and performing its other obligations under this Agreement, including, without limitation, salaries and benefits of Agent's employees and representatives, travel, administrative, entertainment, all other operating expenses (including any required license and permitting fees) and all applicable federal, state and local taxes. The Company shall provide, at the Company's expense, business forms and advertising materials bearing the Company's name and logo for Agent's use in selling, marketing, and providing Services and performing its other obligations under this Agreement's terms.

(c) *No Authority to Incur Expenses on the Company's Behalf.* Except to the extent expressly provided in this Agreement, Agent shall not enter into any contract or agreement by or on behalf of the Company, or extend credit or agree upon payment terms on the Company's behalf.

(d) *Diligence; Customer Liaison.* Agent agrees that it will use its diligent best efforts to market, sell, and provide the Services and to act as liaison between the Company and its customers.

(e) *Agent's Office; Hiring and Training Personnel.* Agent will procure or provide, at its own expense, such office space and facilities, and hire and train such personnel, as Agent determines in its sole discretion may be required to carry out its obligations under this Agreement.

(f) *Promotional Materials.* Agent will not use any advertising or promotional materials to market, promote, or provide Services that have not been provided by the Company (at the Company's expense), unless the Company has previously approved in writing the use of such materials.

(g) *Agent's Authority.* This Agreement shall not constitute a general grant of authority to Agent to bind the Company. Agent may negotiate rates with the Company's list of approved vendors and carriers ("Approved Vendors"). In performing its obligations under this Agreement, Agent shall not engage any transportation or freight services from any vendor or carrier other than an Approved Vendor. All invoices from Approved Vendors shall be sent directly to the Company, and subject to this Agreement's other terms, the Company shall pay such invoices directly to the Approved Vendors.

(h) *Agent's Insurance Coverage.* Agent will obtain and maintain insurance policies with reputable insurers that provide such coverage for its operations that is customary and prudent in its industry, including, without limitation, public liability insurance and, to the extent required by applicable law, workers' compensation insurance for its employees, and will cause the Company to be added to such policies as an additional loss payee. Upon the Company's request, Agent will provide copies of all its policies and certificates of current coverage to the Company.

(i) *Compliance with Laws.* Agent will comply with all applicable federal, state, and local laws, rules, regulations and ordinances in connection with marketing, selling, or providing Services and performing its other obligations under this Agreement.

(j) *No Questionable Payments.* Agent will not, directly or indirectly, in the name of, on behalf of, or for the benefit of the Company offer, promise, or authorize to pay, or pay any compensation, or give anything of value to, (i) any official, agent, or employee of any government or governmental agency, (ii) any political party or officer, employee, or agent thereof, (iii) any candidate for political office, or (iv) any officer or employee of any customer, to

3

the extent such compensation or payment to the customer's officer or employee violates any applicable law or corporate policy of such customer. Agent will also fully comply with its obligations under the Anti-Kickback Agreement, which it will execute separately with the Company.

3.2 <u>Customer Accounts.</u>

(a) Before selling or providing Services to any prospective customer, Agent must comply with the Company's policies and procedures on account clearance, credit limits and payment terms. Agent further agrees not to sell or provide Services to any customer to the extent its outstanding receivables are outside the approved terms or credit limits or to the extent such Services would result in an accounts receivable balance in excess of the approved credit limits for such customer.

(b) Agent will be primarily responsible for finalizing shipments for the customers for Services and shall use its best efforts to invoice 48 hours after the delivered date of the shipment of the customer's goods or the performance of other Services, as the case may be.

(c) Agent will have no authority to request or accept payment for Services from customers on behalf of the Company.

(d) Agent will be liable to the Company for any accounts receivables balances booked in violation of the provisions of <u>Section 3.2(a)</u> and for any accounts receivables that are uncollected as a result of Agent's negligence, breach of this Agreement, or failure to adhere to the Company's policies and procedures. The Company may, in its discretion, collect any or all liability of Agent under the preceding sentence (the "<u>Excess Bad Debt</u>") by offsetting such amounts against Commissions to which Agent is entitled in accordance with <u>ARTICLE IV</u> of this Agreement. To the extent a customer or Agent has not paid the Company an Excess Bad Debt before the earlier of (i) 12 months from the date of the uncollected invoice and (ii) the termination of this Agreement for any reason, then Agent will pay the Company the amount of the uncollected Excess Bad Debt, plus interest at the rate of the lesser of (A) 1.5% per month and (B) the highest applicable legal rate from the invoice date until such Excess Bad Debt is paid in full to the Company. For purposes of this <u>Section 3.2(d)</u>, customer payments shall be applied against referenced invoices, and if the customer does not reference an invoice with its payment, then against the oldest outstanding invoices first.

(e) Agent will be liable to refund to the Company for any and all Commissions paid to Agent on Services for which the Company does not ultimately collect.

3.3 <u>Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment.</u> Contemporaneously with the execution and delivery of this Agreement, Agent shall execute and deliver to the Company the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, attached as <u>Exhibit A</u> to this Agreement.

4

## ARTICLE IV
## COMPENSATION

4.1 <u>Compensation</u>. Subject to the provisions of this <u>ARTICLE IV</u> and Agent's performance of its obligations under this Agreement, the Company will pay Agent a commission ("<u>Commissions</u>") equal to a percentage of the Net Revenue (as defined below) as specified on Schedule A hereto for Services sold by Agent to customers pursuant to orders procured by Agent in accordance with this Agreement. Agent will not be entitled to any Commissions from sales in violation of <u>Section 3.2(a)</u> or with respect to invoiced amounts that Agent instructs the Company to "write off." The term "<u>Net Revenue</u>" means (a) the amount of each customer invoice for Services procured by Agent in accordance with this Agreement less (b) all transportation related charges, including, without limitation, truck transportation, rail and shipping freight charges, and drayage charges, in each case, without regard to early payment discounts or volume incentives or discounts.

4.2 <u>Manner of Payment</u>. Payment of all Commissions shall be made, at the Company's election, (a) by bank check payable to Agent and mailed to Agent's address reflected in the Company's records, or (b) by wire transfer to a national or state bank in the United States designated in writing by Agent for credit directly to an account in the name of Agent.

4.3 <u>Time of Payment</u>. The Commissions shall be payable weekly based on invoices to customers from the immediately preceding week.

4.4 <u>Split Commissions</u>. In situations where an order is or is claimed to have been solicited by more than one agent of the Company, including Agent, the Company may pay a split Commission to the agents involved. In no event will the Company be required to pay more than the amount of one full Commission applicable to any customer invoice.

4.5 <u>Set-Off</u>. The Company may withhold payment of any amounts due and payable to Agent under this Agreement by reason of any setoff of any amount due and payable by Agent to the Company, whether relating to this or any other Agreement between Agent and the Company, Agent's bankruptcy, or otherwise.

4.6 <u>Chargebacks</u>. The Company shall have the right to chargeback Agent's Commission account the amount of any refund or credit to the account of any customer based on the customer's claim that no order for Services was submitted or for any other reason presented by customer. The Company shall, in its sole discretion, but after consultation with Agent, determine if the refund or credit is to be made in response to a customer complaint. If Agent has no Commissions to chargeback against, then Agent will promptly pay to the Company the amount of any Commission it received with respect to any such refunded or credited amount.

4.7 <u>Disputes</u>. Agent shall notify the Company in writing of any dispute regarding any payment of Commissions (along with a reasonably detailed description of the dispute) within 14 calendar days from the date of Agent's receipt, or expected receipt, of the disputed Commission. Agent will be deemed to have accepted all Commissions for which the Company does not receive timely notification of a dispute, pursuant to this Section 4.7. Agent and the Company shall seek to resolve all such disputes expeditiously and in good faith. Notwithstanding anything to the contrary, Agent shall continue performing its obligations under this Agreement during any such dispute.

## ARTICLE V
## INDEMNIFICATION

5.1 <u>Indemnification</u>.

(a) Agent agrees to indemnify and hold the Company, its officers, directors, employees, successors, and assigns harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that any of them sustain or incur as a result of Agent or any of its employees or agents (i) breaching

5

any provision of this Agreement, (ii) making representations or statements not specifically authorized by the Company herein or otherwise in writing, (iii) marketing, selling, or providing Services to customers other than as expressly authorized in this Agreement, (iv) violating any applicable law, rule, regulation, ordinance or order, or (v) any other negligent acts or omissions or contractual breaches.

(b) The Company agrees to indemnify and hold Agent harmless against all losses, damages, or expenses of whatever form or nature, including attorneys' fees and other costs of legal defense, whether direct or indirect, that it sustains or incurs as a result of any acts or omissions of the Company or any of its employees or agents, including but not limited to (i) breaching any provision of this Agreement, or (ii) violating any applicable law, rule, regulation, ordinance or order.

## ARTICLE VI
## TERM AND TERMINATION

6.1 Term. Unless terminated as provided in Section 6.2 below, this Agreement will continue in full force and effect for an initial term of one year commencing on the effective date hereof. Thereafter, this Agreement will be automatically renewed for subsequent one-year terms unless written notice of termination of this Agreement is given by a party: (i) pursuant to Exhibit B; or (ii) to the other Party at least 120 days in advance of the termination of the initial term or any renewal term, as the case may be.

6.2 Termination. This Agreement may be terminated prior to expiration of the initial or any renewal term, as provided in Section 6.1, by written notice to the other Party:

(a) By the mutual written consent of the Company and Agent; provided, however, that if Agent requests the Company's mutual consent to a termination of this Agreement as a result of (i) Agent's death or disability or that of Agent's key employee or owner, (ii) Agent's or its key employee's/owner's determination to retire, or (iii) the sale of Agent's business, or (iv) Agent's determination to pursue a line of business outside the transportation or logistics industry that is not competitive with the Business or the Services, then the Company will not unreasonably withhold its consent to such termination, provided Agent diligently assists the Company in transitioning all its customers for Services and other Business related activities to another agent of the Company; or

(b) By the Company, at any time after the occurrence or existence of the following conditions, each of which shall constitute grounds for termination for "Cause" as that term is used in Paragraph 6.4(a):

(i)   Agent's breach of any of its representations or covenants in this Agreement, if Agent fails to cure such breach within 15 days after receiving a written notice thereof from the Company; provided, however, that the Company will only be required to provide notice and an opportunity to cure two non-similar breaches in any 12-month period;

(ii)  Agent becomes insolvent or the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceeding or make an assignment or other arrangement for the benefit of its creditors;

(iii) If the Company determines in good faith that Agent has engaged in conduct that is detrimental or harmful to the Business, there is a significant change in Agent's ownership or management, or Agent's financial condition is such that it cannot adequately market or provide Services or comply with the Company's policies and procedures;

6

(iv) Agent's attempt to sell, assign, delegate or transfer any of its rights and obligations under this Agreement without having obtained the Company's prior written consent thereto;

(v) the Company obtains knowledge that Agent's representation in Section 2.2 or 2.4 is false in any material respect;

(vi) the Agreement does not renew under the terms of Exhibit B and the Company and Agent fail to renew the Agreement in writing pursuant to Exhibit B; or

(vii) Agent breaches or otherwise fails to perform its obligations under the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment; or

(c) By Agent, effective immediately if the Company fails to pay Agent the Commissions when due and if the Company fails to make such payment within 15 days after receiving written notice thereof from Agent; provided, however, that Agent will only be required to provide notice and an opportunity to cure such failure to pay twice in any 12-month period.

6.3 Rights of Parties on Termination. In addition to the other applicable provisions of this Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment, the following provisions apply upon the termination or expiration of this Agreement:

(a) Agent will immediately cease soliciting orders for, and providing, Services.

(b) All indebtedness of Agent to the Company shall become immediately due and payable without further notice or demand, which is hereby expressly waived, and the Company shall be entitled to reimbursement for any reasonable attorneys' fees that it may incur in collecting or enforcing payment of such obligations. Notwithstanding anything to the contrary in this Agreement, following the termination of this Agreement for any reason, the Company will be entitled to withhold payment of Commissions to Agent until it is able to determine the amount of the liability, if any, of Agent to the Company and audit the calculation of the Commissions payable to Agent.

(c) Agent will remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by the Company, or of any word, title, expression, trademark, design, or marking that, in the discretion of the Company, is confusingly similar thereto. In addition, Agent will certify in writing to the Company that Agent has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or expression similar thereto that appeared in or on any devices or other materials used in conjunction with Agent's business.

(d) Under no circumstances will the Company be liable to Agent (i) for Commissions or any other compensation to Agent with respect to the Business, or Services by or on behalf of the Company, after the termination, nonrenewal, or expiration of this Agreement, or (ii) for any damages, losses or expenses arising as a result of the Company's determination not to renew this Agreement or its termination of this Agreement in accordance with its terms, including, without limitation, loss of prospective compensation, goodwill, and expenses paid or incurred in anticipation of a future business relationship with the Company.

6.4 Disposition of Customer Relationships on Termination. In addition to the foregoing obligations of Agent and rights of the Company upon termination of this Agreement, the Parties agree to the following disposition of customer relationships depending on whether the Agreement is terminated 1) for cause, 2) because of retirement of Agent's key personnel, 3) due to death or disability of Agent's key personnel, or 4) due to Company's consent to Agent's sale of its business.

(a) Cause. If the Company terminates this Agreement for cause under the provisions of Paragraph 6.2(b), Agent is not allowed to retain, transfer, or redirect customer relationships and agrees to avoid taking any action likely to prevent current customers from doing business with

7

Company. Agent further agrees that Company may enforce this provision by injunctive relief or otherwise if current customers' info is taken for terminated Agent's benefit.

(b) Retirement. If Agent desires to terminate this Agreement with the consent of the Company due to the retirement of such personnel of Agent as would materially affect Agent's ability to provide Services: Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(c) Death and Disability. If Agent desires to terminate this Agreement with the consent of the Company due to the death or disability of such personnel of Agent as would materially affect Agent's ability to provide Services, or if Agent is an individual: Agent agrees that, as a condition of Company's consent to termination of this Agreement due to retirement, Agent will execute a "Customer Transition Personal Services Agreement" and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

(d) Sale of New Line of Business. If Agent obtains Company's consent to a sale of Agent's business, or Agent pursuing a line of business outside of the transportation and logistics industry that is not competitive with the Business or the Services: Agent agrees that, as a condition of Company's consent to termination of this Agreement due to sale, Agent will execute the Customer Transition Personal Services Agreement and exercise best efforts to ensure the smooth transfer of customer relationships to Company or Company's other agents.

ARTICLE VII
GENERAL PROVISIONS

7.1 Entire Agreement. This Agreement, including the Appendices, Exhibits and/or Schedules hereto, represents the entire Agreement between the parties on the subject matter hereof and supersedes all prior discussions, agreements, and understandings of every kind and nature between them. There are no conditions to this Agreement not expressed herein. No modification of this Agreement will be effective unless in writing and signed by both parties.

7.2 Notices. All notices under this Agreement shall be in writing and given by registered or certified mail or commercial courier service (e.g. FedEx) or facsimile, addressed to such parties at the addresses set forth below, or to such other address of which either party may advise the other in writing. Notices will be deemed given when delivered.

If to the Company:

First Star Logistics, LLC
11461 Northlake Boulevard
Cincinnati, OH 45249
Attn:    Todd Hammerstrom
Phone:  812-637-3251
Fax:      812-637-2508

If to Agent:

Erica Cuthbertson
9302 Vicksburg Park Ct
Charlotte NC  28210

7.3 Force Majeure. Neither party shall be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any

8

cause beyond the reasonable control and without the fault or negligence of such party. Such causes shall include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, terrorist acts, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prevent either party from performing its obligations under this Agreement.

7.4 <u>Severability</u>. The illegality or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any legal and enforceable provisions hereof.

7.5 <u>Assignment</u>. This Agreement shall be binding on and inure to the benefit of the successors and assigns of the business interests of the Company and may be assigned by the Company. Agent shall not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Company, which may be withheld at the Company's sole discretion.

7.6 <u>Applicable Law; Venue</u>. This Agreement shall be construed, enforced, and performed in accordance with Ohio law, without reference to its principles of conflicts of laws. The Parties hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court in Hamilton County, Ohio, over any action, suit or proceeding arising out of or relating to this Agreement. The Parties irrevocably and unconditionally waive any objection to the venue of any such action, suit or proceeding brought in any such court and any claim that any such action, suit or proceeding has been brought in an inconvenient forum. Agent acknowledges and agrees that its performance under this Agreement is due and owing to the Company in Hamilton County, Ohio, and that a substantial portion of the duties and obligations of the parties are to be performed in Hamilton County, Ohio.

7.7 <u>Waiver</u>. Each Party agrees that the other Party's failure at any time to require performance of any of the provisions this Agreement shall not operate as a waiver of the right of such other party to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

7.8 <u>Construction</u>. Any headings used herein are for convenience in reference only and are not a part of this Agreement, nor shall they in any way affect the interpretation hereof. The Parties intend that every covenant, term, and provision of this Agreement will be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting party), it being understood that the Parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests and to otherwise review and negotiate the provisions of this Agreement.

7.9 <u>Counterparts</u>. This Agreement or any amendment hereto may be signed in any number of counterparts, each of which will be an original, but all of which taken together will constitute one agreement or amendment, as the case may be.

**[Signature page follows]**

9

**COMPANY:**

First Star Logistics, LLC

By: _____

Todd Hammerstrom

Its:    Executive VP

Date: _____9-1-18_____

0130771.0626281   4843-9280-8007v1

**Agent Name:**

By: _____

*Signature*

_____

*Print Name*

Date: _____Aug 29.18_____

10

<u>**EXHIBIT A**</u>

**Agreement Regarding**
**Confidentiality, Non-Solicitation, and Non-Recruitment**

     This Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment (this "<u>Agreement</u>") is made and entered into on this _Aug 29, 18_ between **First Star Logistics LLC,** a Delaware limited liability company, its subsidiaries, affiliates, successors and assigns (collectively referred to as the "<u>Company</u>"), and _Erica Cutino_ and all its agents, employees, owners, officers, and representatives (collectively, the "<u>Agent</u>").

     WHEREAS, contemporaneously with this Agreement's execution and delivery, the Company and Agent are entering into that certain Sales Agent Agreement (the "<u>Sales Agent Agreement</u>"); and

     WHEREAS, Agent's execution and delivery of this Agreement is a condition precedent to the Company entering into the Sales Agent Agreement.

     NOW, THEREFORE, the Parties agree:

A. <u>**Confidentiality**</u>

     **1. Promise to Provide Confidential Information.** At this Agreement's inception, and continuing on an ongoing basis during the Term of the Sales Agent Agreement, the Parties agree to provide each other with Confidential Information (defined below). This information (the "<u>Confidential Information</u>") includes business, proprietary, and technical information not known to others that could have economic value to others if improperly disclosed. "<u>Confidential Information</u>" also means any information disclosed to either party, either directly or indirectly, in writing, orally or by inspection of tangible objects, including without limitation, information and technical data contained in manuals, booklets, publications and materials and equipment of every kind and character, as well as documents, financial statements, prototypes, samples, prospects, inventions, trade secrets, product ideas, technical information, know-how, processes, plans (including without limitation, marketing plans and strategies), specifications, designs, methods of operations, techniques, technology, formulas, software, improvements, financial and marketing information, forecasts, research, and the identity of any and all customers, consultants, and suppliers.

     **2. The Value of Confidential Information.** By executing this Agreement, the Parties agree that the Confidential Information constitutes valuable, special and unique assets developed by each party at great expense, the unauthorized use or disclosure of which would cause irreparable harm to the other party. The parties understand and acknowledge that each party is engaged in a highly specialized and competitive industry; that each party relies heavily on information, data, programs and processes it has developed and acquired; and that competitors can reap potential or real economic benefits from the possession of Confidential Information that is otherwise not available to them. The Parties understand and acknowledge, therefore, that the protection of the Confidential Information constitutes a legitimate business interest of both parties. The Parties acknowledge that the Confidential Information is the exclusive property of the providing party and is to be held by the other party and its employees and representatives in trust and solely for the providing party's benefit. The Parties further acknowledge that the Confidential Information includes "trade secrets" under Ohio and any other applicable law and, in addition to the other protections provided herein, all trade secrets shall be accorded the protections and benefits under Texas and any other applicable law. Each party waives any requirement that other party submit proof of economic value of any trade secret or post a bond or other security should the need arise.

3. **Promise Not to Use or Disclose Confidential Information.** In exchange for providing party's promise to provide the receiving party with new Confidential Information, the receiving party hereby agrees that neither it nor any of its employees or representatives shall, either during the term of the Sales Agent Agreement or at any time thereafter, disclose to anyone, including, without limitation, any person, firm, corporation, or other entity, or publish, or use for any purpose, any Confidential Information, except as properly required in the ordinary course of the providing party's business or as providing party directs and authorizes. The receiving party hereby further agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and agrees to immediately notify the providing party if there is any unauthorized use or disclosure of the Confidential Information. The receiving party hereby further agrees that it shall be liable for its agents', employees', owners', officers', and representatives' disclosure or use of Confidential Information in violation of the provisions of this Agreement.

4. **Agreement to Return Confidential Information and Property.** Upon the termination of the Sales Agent Agreement, regardless of the reason for such termination:

    (a) The parties will not take, destroy, or delete, and shall prevent its employees and representatives from taking, destroying, or deleting, any files, documents or other materials embodying or recording any Confidential Information, including copies, without obtaining in advance the written consent of an authorized representative of providing party; and

    (b) The receiving party will, and will cause its employees and representatives to, promptly return to the providing party all Confidential Information, documents, files, records and tapes (written or electronically stored) that have been in its possession or control, and the receiving party will not use or disclose, and will cause its employees and representatives not to use or disclose, such materials in any way or in any format, including written information in any form, information stored by electronic means, and any and all copies of such materials. The receiving party further agrees that at the termination of the Sales Agent Agreement, regardless of the reason for such termination, or upon providing party's request, the receiving party will, and cause all its employees and representatives to, return immediately all providing party's property, including, without limitation, keys, equipment, computer(s) and computer equipment and software, access codes, devices, data, lists, information, correspondence, notes, memos, reports, or other writings.

    If at any time after the termination of the Sales Agent Agreement for any reason, the receiving party determines that it or any of its employees or representatives have any Confidential Information of the providing party or property in its possession or control, the receiving party shall, and shall cause such employee or representative to, immediately return such Confidential Information or property to the providing party, including all copies and portions thereof. At the providing party's request, the receiving party agrees to execute a written certification to the providing party at the time of the termination of the Sales Agent Agreement certifying that the receiving party has complied with its obligations under this Section A.4.

5. **Legally Required Disclosure of Confidential Information.** If Confidential Information known to either party or its employees or representatives or in its or their possession is subject to a lawful production order by any judicial, regulatory, administrative, legislative, or governmental authority, or any other person or entity, the receiving party agrees to notify the providing party promptly that such lawful order has been received. If the receiving party or any of its employees or representatives is required to disclose the Confidential Information pursuant to such lawful order, then the receiving party agrees to use its commercially reasonable efforts to obtain assurances that the Confidential Information will be maintained on a confidential basis and not be disclosed to a greater degree than legally required.

2

**6. Third Party Information.** The parties recognize that each party has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on either party's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The parties agree to hold, and to cause its employees and representatives to hold, all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary to sell, market, and perform the services and consistent with either party's agreement with such third party.

## B. Non-Solicitation and Non-Recruitment

Agent agrees that to protect the Confidential Information, it is necessary to enter into the following restrictive covenants, which are ancillary to the enforceable promises between the Company and Agent in Section A of this Agreement.

**1. Non-Solicitation.** Agent agrees that during the term of the Sales Agent Agreement, and for a period of 365 days following the termination of Sales Agent Agreement for any reason, Agent (including its owners, employees, officers, directors, and representatives) will not, directly or indirectly, either individually or as a principal, partner, agent, consultant, contractor, employee, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of the Company, solicit business, or attempt to solicit business, in products or services competitive with products or services sold by the Company, from any Customer of the Company. For the purposes of this Section B.1, "Customer" means any company or individual who purchases Services (as defined in the Sales Agent Agreement) from the Company during the period between the commencement of the Sales Agent Agreement and the termination of the Sales Agent Agreement in accordance with its terms. Subject to the terms and conditions of the Sales Agent Agreement, this Non-Solicitation provision will not apply to those customers listed on Schedule B. However, nothing in this Section B.1 prevents Agent from soliciting business, or attempting to solicit business, on behalf of the Company from any customers listed on Schedule B. Notwithstanding any purchase of Services from Company resulting from such solicitation, this Section B.1 shall not apply to those customers listed on Schedule B.

**2. Non-Recruitment.** Agent agrees that during the Term of the Sales Agent Agreement, and for a period of one year following the date of the termination of the Sales Agent Agreement for any reason, Agent agrees that it will not, directly or indirectly, hire, solicit, induce, recruit, engage, go into business with, encourage to leave their employment with the Company or terminate any agreement with the Company, or otherwise contract for services with, any employee or agent of the Company, or any former employee or agent of the Company whose employment with the Company ceased or whose sales agent agreement with the Company terminated less than six months earlier.

**3. Nature of the Restrictions.** Agent agrees that the time, geographical area, and scope of restrained activities for the restrictions in Section B.1 of this Agreement are reasonable, especially in light of the Company's desire to protect its Confidential Information, and that the restrictions in Section B.1 of this Agreement will not preclude Agent or its owners from gainful employment if this Agreement is terminated for any reason. If a court concludes that any time period, geographical area, or scope of restrained activities specified in Section B.1 of this Agreement is unenforceable, the court is vested with the authority to reduce the time period, geographical area, and/or scope of restrained activities, so that the restrictions may be enforced to the fullest extent permitted by law. Additionally, if Agent or its owners violate any of the restrictions contained in Section B.1 of this Agreement, the restrictive period shall be suspended and will not run in favor of Agent from the time of the commencement of any such violation until the time when Agent cures the violation to the Company's satisfaction.

3

## C. **Miscellaneous**

**1. The Company's Remedies.** Agent acknowledges that this Agreement's restrictions, in view of the nature of the Company's business, are reasonable and necessary to protect the Company's legitimate business interests and that any violation of this Agreement would result in irreparable injury to the Company for which there is no adequate remedy at law. If there is a breach or a threatened breach of any provision in this Agreement, the Company shall be entitled to a temporary restraining order and injunctive relief restraining Agent, its owner, employees and representatives from the commission of any breach, and to recover the Company's attorneys' fees, costs and expenses related to the breach or threatened breach. Nothing contained in this Agreement shall be construed as prohibiting the Company from pursuing any other remedies available to it for any breach or threatened breach, including, without limitation, the recovery of money damages, equitable relief, attorneys' fees, and costs. The existence of any claim or cause of action by Agent against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the Company's enforcement of this Agreement.

**2. Notification of Subsequent Employers.** If Agent or any of its owners, in the future, seeks or is offered employment by, or to serve as the independent agent for, any other company, firm, or person, Agent shall provide, or shall cause to be provided, a copy of this Agreement to the other company before accepting employment with, or becoming an independent agent for, the other company.

**3. Oaths and Verifications.** Agent agrees to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.

**4. Governing Law and Consent to Personal Jurisdiction.** This Agreement shall, in all respects, be interpreted, enforced, and governed under Ohio law without regard for its conflicts of laws principles. Agent consents to the personal jurisdiction of and agrees that venue will lie exclusively with the state and federal courts located in Hamilton, County for any dispute related to this Agreement or the parties' respective obligations under it.

**5. Construction.** The language of this Agreement will be deemed the language chosen by the parties to express their mutual intent and shall, in all cases, be construed as a whole, according to its fair meaning, and not strictly for, or against, either party.

**6. Severability and Reformation.** Should a court determine that any paragraph or sentence, or any portion of a paragraph or sentence, of this Agreement is invalid, unenforceable, or void, this determination shall not have the effect of invalidating the remainder of the paragraph, sentence or any other provision of this Agreement. Further, the court should construe this Agreement by limiting and reducing it only to the extent necessary to be enforceable under then applicable law.

**7. Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties to it and their heirs, successors and assigns.

**8. No Waiver.** Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision hereof.

**9. Counterparts.** The Company and Agent agree that this Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same instrument.

**10. Excluded Accounts.** The Company and Agent have agreed that certain accounts of Agent are excluded from the operation of certain provisions of this Agreement and the Sales Agent Agreement as further detailed in Schedule B to the Sales Agent Agreement.

**11. Entire Agreement and Amendment.** Except for the Sales Agent Agreement, including the Appendices, Exhibits and/or Schedules thereto, this Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior discussions between the parties with respect to the subject matter of this Agreement. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

IN WITNESS WHEREOF, the undersigned have executed **Exhibit A** of the Sales Agent Agreement as of the date first above written.

*COMPANY:*

First Star Logistics LLC

By: _____
      Todd Hammerstrom

Its:    Executive VP

*AGENT NAME:*

By: _____
    *Signature*

Erica Cuthbertson
    *Print Name*

Its:  _____

5

## EXHIBIT B

### Statement of Work

Agent shall meet the Minimum Annual Sales Quota ("Quota") for each year this Agreement is in effect. The Company will monitor progress towards the annual commitment quarterly. The Company will provide Agent with a Quarterly Report reflecting the total Net Revenue Agent is responsible for as of that date.

Pursuant to Section 6.1 of the Agreement, if Agent fails to achieve the Quota, the Agreement will not automatically renew. Upon such occurrence, Sections 6.3(a), (b), and (d) of the Agreement will take effect immediately. If Agent and the Company do not thereafter renew the Agreement in writing within 30 days of Agent's failure to achieve the Quota, the Agreement will terminate for Cause pursuant to Section 6.2 of the Agreement.

For purposes of the Agreement, the Minimum Sales Quota is **$50,000** in annual Net Revenue.

6

## SCHEDULE A

### Sales Commission

The following sales Commission, as defined and calculated in this Agreement, will be **65%** for the term of this Agreement unless otherwise determined by the terms of this Agreement. Pursuant to Section 4.5 of the Agreement, Agent agrees the Company may withhold all or a portion of the Commission equal to any amount due and payable by Agent to the Company, including any outstanding payments under Schedule C, if applicable.

_____ Initials – FSL

_____ Initials – Agent

7

## SCHEDULE B

### Excluded Accounts

The Company and Agent agree that the following accounts are existing, active accounts of Agent opened prior to the execution of the Sales Agent Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment. The following accounts are excluded from the operation of Section 6.4 of the Sales Agent Agreement (Disposition of Customer Relationships on Termination) and from the operation of Section B.1 and Section B.2 of the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment. This Schedule B to the Sales Agent Agreement in no way excuses or limits the obligations of Agent or the rights and remedies of the Company regarding any other provision of the Sales Agent Agreement and the Agreement Regarding Confidentiality, Non-Solicitation, and Non-Recruitment. Furthermore, any account listed on this schedule shall be removed from this schedule and not excluded if, during any 180 consecutive day period during the term of the Sales Agent Agreement, Agent fails to generate any revenue (determined on an accrual basis) from that account.

**[Sales Agent to attach list of accounts]**

8

## SCHEDULE C

### Rental of Office Space and Equipment

Pursuant to Section 3.1(e) of the Agreement, Agent must procure or provide, at its own expense, such office space and facilities as Agent determines in its discretion may be required to carry out its obligations under the Agreement. Accordingly, Agent may elect to rent such office space and facilities from the Company, upon the following terms:

1. The monthly rent shall be $4.00, payable in advance on the first day of the calendar month. If Agent elects to rent office space and facilities from the Company on a day other than the first calendar day of the month, Agent shall pay in advance the value of a full month's rent on the day of the election. Thereafter, Agent shall pay on the first day of the calendar month.

2. Agent's use of the office space and facilities shall be in a lawful, careful, safe, and proper manner, and Agent shall carefully preserve, protect, control and guard the same from damage.

3. Relating to destruction of or damage to the office space and equipment, Agent shall, at its sole cost and expense, keep and maintain the office space and equipment in a condition and repair similar to its original condition and repair, reasonable wear and tear excepted. Accordingly, Agent agrees to pay on the first day of the calendar month, in addition to the monthly rent, a $1.00 maintenance fee.

4. Agent shall not make any improvements, alterations, or additions to the office space and facilities, whether structural or nonstructural, interior or exterior.

5. Whenever Agent or Company terminates any election made by Agent under this Schedule C, whether by lapse of time or otherwise, Agent shall at once surrender possession of the office space and facilities to the Company in a condition and order of repair substantially similar to its original condition and order of repair upon the commencement of the rental term, reasonable wear and tear excepted, and shall at once remove all of Agent's personal property from the premises.

6. If Agent hires any personnel pursuant to Section 3.1(e) of the Agreement, such personnel may access and use the office space and facilities. Notwithstanding such use, Agent shall not assign this Rental of Office Space and Equipment or sublet the office space and facilities, or any part thereof.

If any provision of this Schedule C and the Sales Agent Agreement conflict, the Sales Agent Agreement governs.

X̲ I do NOT elect to rent office space and facilities from the Company.

_____ I DO elect to rent office space and facilities from the Company, effective this _____ day of _____, 20___.

**[Signature Page Follows, If Applicable.]**

9

**IN WITNESS WHEREOF**, the Company and Agent, through their duly authorized representatives, have executed this **Sales Agent Agreement** as of the Effective Date.

*COMPANY:*

First Star Logistics, LLC

By: _____

Todd Hammerstrom

Its:    Executive VP

*AGENT NAME:*

By: _____
        *Signature*

_____
        *Print Name*

Its:    _____

10

**EXHIBIT 2**

## NON-DISCLOSURE AND RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement ("Agreement") is entered into this 10th day of NOV, 2018, by and between Erica Luther (employee) and First Star Logistics, a Delaware limited liability company and/or any successor, assign, parent company, or subsidiary thereof (hereafter "FSL") (together, the "parties" or each individually a "party").

In consideration for beginning or continuing employment with FSL, Employee hereby agrees to the following terms of employment:

1.  **Acknowledgements.** Employee understands and acknowledges each of the following:
    a. FSL is in the business of providing transportation logistics services to the transportation industry.
    b. Employee, over the course of his/her employment, has been or will be exposed to FSL's Confidential Information (as defined below), and will develop or has developed substantial knowledge of the business of FSL.
    c. Employee's participation in a business that competes with FSL immediately subsequent to his/her employment with FSL would have severe and irreparable adverse effect upon the business and operations of FSL because of the Confidential Information Employee will learn while employed by FSL.
    d. Employee's employment with FSL is at will. Employee retains the right to leave employment at any time with or without a reason. Likewise, FSL retains the right to terminate Employee's employment at any time and with or without a reason, except for reasons prohibited by law. This Agreement shall remain in effect after the termination of Employee's employment, regardless of the reason for the termination.

2.  **Definitions.**

    a. **Confidential Information.** "Confidential Information" means the following: (i) whether or not reduced to writing or other tangible medium of expression: all information, documents, software, reports, projections, research, processes, methods, techniques, data, lists, records, contacts, forms, inventions, discoveries, designs, specifications, models, products and other material either provided by FSL or any of its Customers or Prospective Customers to the Employee, or created, developed, or delivered by the Employee in the course the Employee's employment; processes, objectives, data, and including any reports, analyses or studies; trade secrets, Customer lists, Prospective Customer lists, Customer transaction history and preferences; Prospective Customer preferences; broker, vendor, and carrier information; Customers' and Prospective Customers' credit information and credit limits; pricing information, price quotes, and profit margins; and other valuable and confidential information furnished by FSL or any of its Customers, together with all business policies and procedures of FSL; and (ii) all information that is marked "Confidential." Notwithstanding the foregoing, Confidential Information does not include information which can be demonstrated to have been: (a) already known to the Employee prior to its contact with FSL; (b) is or becomes generally available to the public other than through a breach of this Agreement; or (c) furnished to the Employee by a third party,

1

that is (1) not an agent of Employee; (2) who is lawfully in possession of such information; (3) was not sought out by Employee; and (4) who lawfully and intentionally conveys such information.

b. **Customers.** "Customers" shall mean individuals, companies, and entities with whom FSL is currently receiving revenue, and individuals, companies, and entities with whom FSL has received revenue in the past twenty-four months.

c. **Prospective Customers.** "Prospective Customers" shall mean individuals, companies, and entities with which FSL has sought to receive revenue during the past twenty-four months via direct contact from an FSL employee or agent, of which a prospective relationship was the subject.

3. **Non-Disclosure.**

a. Employee agrees that, during the period of employment relationship with FSL, and for so long thereafter as any Confidential Information received by it remains Confidential Information, Employee shall not at any time disclose to any person or entity, or use for its own benefit or the benefit of any third party, such Confidential Information without the prior written consent of FSL.

b. Without limiting the disclosure restrictions set forth above, Employee agrees that, prior to the disclosure of any Confidential Information received from FSL to any third party, Employee shall obtain: 1) FSL's written authority to provide specified Confidential Information to such third party; and 2) a written agreement from such third party in which the third party agrees to the same terms as set forth herein.

c. Nothing in this Agreement shall be construed to convey to Employee any license or any right, title, or interest in such Confidential Information. This Agreement does not in any way bind either party to enter into or continue an employment or business relationship of any type with the other.

d. It shall not be a violation of this paragraph for Employee to disclose Confidential Information to the extent necessary to comply with a properly obtained court or other governmental order, provided that Employee gives FSL written notice of such disclosure at least five (5) business days in advance of such disclosure and makes a reasonable effort to maintain the confidentiality of the Confidential Information through a protective order or other means available under the circumstances.

4. **Ownership and Return of Confidential Information.**

a. FSL represents that it has the right to furnish to the Employee the Confidential Information.
b. FSL desires to convey no rights, title, or interest in such Confidential Information to Employee and also to assure that Employee exercises no rights to or dominion over such Confidential Information and maintains the confidentiality of such Confidential Information.

2

c. Employee agrees, upon written request of FSL, to immediately deliver to FSL any Confidential Information and any copies thereof which Employee has, has access to, or may have received during the term of this Agreement; and to delete, in a manner so as to make the information non-recoverable, all electronically stored Confidential Information, including Confidential Information stored on Employee's own personal computer equipment, including but not limited to Employee's cell phone, personal data assistant, laptop computer, home computer, or tablet device.

d. Within three (3) business days of termination of this Agreement between the Parties, or any business relationship between the Parties, whichever is earlier, Employee shall deliver to FSL any and all Confidential Information in its possession or under its control, and provide a written statement that all electronically stored information has been deleted as set forth above. Employee shall make and keep no summaries, notes, copies or outlines of such Confidential Information.

**6. Restrictive covenants and Notification Obligations.**

a. Employee covenants and agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, that, without the express prior written permission of FSL, the Employee will not directly or indirectly, either as principal, agent, employee, stockholder or co-partner or in any other individual or representative capacity, or in any relation whatsoever:

    i. Solicit, divert or take away or attempt to solicit, divert or take away, any of the Customers, Prospective Customers, agents, brokers, carriers, or employees of FSL;

    ii. Attempt to seek or cause any Customers, agents, brokers, carriers, or employees of FSL to refrain from continuing their relationship with FSL;

    iii. Knowingly solicit employment from, or a contractual relationship with, FSL's agents, brokers, carriers, or employees; or

    iv. Be employed by, perform services for, or receive compensation from, any individual or entity who completes with FSL.

b. These restrictive covenants on the part of Employee shall be construed as agreements independent of any other provision of this Agreement, by and between FSL and Employee, and the existence of any claim or cause of action of Employee against FSL, whether based on this Agreement or otherwise, shall not constitute a defense to the enforcement by FSL of this covenant.

c. Employee shall, upon termination of his/her employment with FSL, and for two (2) years after the date of termination from FSL, immediately notify:

    i. FSL, or any purchaser of FSL, of the name, address, and nature of the business of Employee's new employer, or the new entity for which Employee will perform services as a consultant or independent contractor, or, if self-employed, the name address, and nature of Employee's new business. Employee shall provide this notification immediately upon securing new employment, engaging to perform services, or commencing Employee's new business, and continue to provide such notification if such employment or services should change.

3

        ii.  Employee's new employer or principal of Employee's restrictions as set forth in this Agreement.

   d.  Notwithstanding Paragraph 9(d), in the event a court finds any portion of this paragraph unenforceable as written, the court shall be allowed to revise the restrictions to cover the maximum period, scope, and area permitted by law.

**7.**    **Reasonableness.** Employee specifically acknowledges that he/she has carefully read and considered the terms of this Agreement, and having done so, agrees that the restrictions set forth in Paragraph 6, including but not limited to the time periods of restriction, are fair and reasonable and are reasonably required for the protection of the interests of FSL.

**8.**    **Injunctive Relief.** In addition to, and not in lieu of, any other remedies to which FSL may be entitled, Employee agrees that a breach or threatened breach of any covenant set forth in this Agreement may result in irreparable injury, harm and damage to FSL, for which FSL would have no adequate remedy at law. Employee further agrees, in the event of any violation, breach, or threatened breach of any provision of this Agreement, FSL shall be entitled to an immediate injunction and restraining order to prevent such violation, continuing violation, or threatened breach without having to prove damages and without being required to post a bond, and any violation of any provision of this Agreement may be enjoined through proper action filed in accordance with the forum selection clause in Paragraph 9.

**9.**    **General.**

   a.  **Governing Law and Forum Selection.** Ohio law governs this Agreement, without regard to conflicts of law principles. Employee consents to the exclusive jurisdiction of the state courts and U.S. federal courts located in Hamilton County, Ohio for any dispute arising out of this Agreement.

   b.  **Merger Clause.** This Agreement terminates and supersedes all prior understandings or agreements between the parties on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

   c.  **No Assignment.** Neither of the parties may assign or delegate any rights or obligations hereunder without first obtaining the written consent of the other party, provided that FSL may assign its rights under this Agreement to any entity that assumes FSL's obligations hereunder in connection with any sale or transfer of all or a substantial portion of FSL's assets to such entity.

   d.  **Severability.** If any term of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then this Agreement, including all of the remaining terms, will remain in full force and effect as if such invalid or unenforceable term had never been included.

   e.  **No Implied Waiver.** Either party's failure to insist in any one or more instances upon strict performance by the other party of any of the terms of this Agreement shall not be construed as a waiver of any continuing or subsequent failure to perform or delay in performance of any term hereof.

4

f. **Successors and Assigns.** This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

g. **Headings.** Headings used in this Agreement are provided for convenience only and may not be used to construe meaning or intent.

h. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

In witness whereof, the parties have executed this Agreement as of the date first written above.

**FIRST STAR LOGISTICS, LLC**

By: _____
(Name, Title)

Date: _NAG 12 18_

**EMPLOYEE**

_Erica Cuthbertson_
(Signature)

_Erica Cuthbertson_
(Printed Name)

Date: _Nov. 10. 2018_

5



ELECTRONIC CERTIFIED MAIL SERVICE RETURN
SUMMONS & COMPLAINT
A 2202185    D1
ERICA CUTHBERTSON
FILED: 07/04/2022  9:35:02

Date Produced: 07/04/2022

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168 6310 0965 3000. Our records indicate that this item was delivered on 06/27/2022 at 01:47 p.m. in CHARLOTTE, NC 28217. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

# **EXHIBIT B**

Customer Reference Number:            17171065SEQ1



ELECTRONIC CERTIFIED MAIL SERVICE RETURN
SUMMONS & COMPLAINT
A 2202185    D1
ERICA CUTHBERTSON
FILED: 07/04/2022  9:35:02

Date Produced: 07/04/2022

HAMILTON COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™ item number 7194 5168 6310 0965 4342. Our records indicate that this item was delivered on 06/27/2022 at 02:33 p.m. in CHARLOTTE, NC 28205. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

## GZJ IDKV'E

Customer Reference Number:          17175053SEQ1

```
ENTERED
SEP 22 2022
```

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

S. C.
Line # :

FIRST STAR LOGISTICS, LLC     *     Case No.: A 2202185

                Plaintiff,     *     Judge Robert Goering

vs.     *     **JUDGMENT ENTRY**

ERICA CUTHBERTSON,     *

                Defendant.     *

D136066722

This matter came before the Court on the Complaint and Motion for Default Judgment ("Motion") filed by Plaintiff First Star Logistics, LLC ("FSL"). The Court finds that good cause exists to grant FSL's Motion. Specifically, the Court finds:

1.     The Court has subject-matter jurisdiction over this matter and personal jurisdiction over Defendant Erica Cuthbertson ("Cuthbertson").

2.     Cuthbertson was properly served with process in this case.

3.     Cuthbertson failed to timely plead or otherwise defend against the Complaint, thereby entitling FSL to a judgment by default.

4.     FSL is entitled to a default judgment of $121,386 which represents FSL's actual damages suffered due to Cuthbertson's actions.

5.     FSL is also entitled to the costs of this action, prejudgment interest, and post judgment interest at the legal rate.

6.     This Court retains jurisdiction over this case for the purpose of enforcing this judgment.

This is a final, appealable order and there is no just reason for delay.

IT IS SO ORDERED.

## GZJ KDKV'D

Dated: **SEP 2 2 2022**

COURT OF COMMON PLEAS
ENTER

HON. ROBERT A. GOERING

THE CLERK SHALL SERVE NOTICE
TO PARTIES PURSUANT TO CIVIL
RULE 58 WHICH SHALL BE TAXED
AS COSTS HEREIN.

MAGISTRATE
SEP 19 2022
HAS SEEN

Prepared By:

/s/ J. Maxwell Williams
J. Maxwell Williams (0099007)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Phone: (513) 651-6800
Facsimile: (513) 651-6981
mwilliams@fbtlaw.com

*Attorney for Plaintiff First Star Logistics, LLC*

0130771.0750160  4857-7085-9311v1



D137178039

**ENTERED**
**JAN 18 2023**

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

FIRST STAR LOGISTICS, LLC     :
        :    **CASE NO. A 2202185**
        **PLAINTIFF,**    :
        :    **JUDGE ROBERT GOERING**
**v.**         :
        :
        :
ERICA CUTHBERTSON,       :
        :
        **DEFENDANT.**    :    **ORDER GRANTING DEFENDANT'S**
        :    **MOTION FOR EXTENSION OF**
        :    **TIME IN WHICH TO FILE HER**
        :    **REPLY**

Upon consideration of Defendant's Motion for Extension of Time to File Her Reply Memorandum In Support of Her Motion to Vacate Default Judgment, it is hereby:

ORDERED: that Defendant's Motion is GRANTED; and further

ORDERED: that Defendant has until January 24, 2023 to file her Reply Memorandum.

**SO ORDERED**

DATED: _1/18/23_

JUDGE ROBERT GOERING

## GZJ KDKV'E





**COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| **FIRST STAR LOGISTICS, LLC,** | : | **Case No. A2202185** |
| **Plaintiff,** | : | **JUDGE ROBERT GOERING** |
| -v- | : | **ORDER GRANTING MOTION TO** |
| | | **SET ASIDE DEFAULT JUDGMENT** |
| **ERICA CUTHBERTSON,** | : | **BUT DENYING SANCTIONS** |
| **Defendant.** | : | |

This matter came before the Court on Defendant Erica Cuthbertson's motion to vacate the default judgment against her and for sanctions. The Court has reviewed the memoranda of counsel, the record, and the law of Ohio and decides as follows:

On October 11 2021, Cuthbertson filed suit against First Star Logistics in North Carolina. In those filings, an address of 9619 Chastain Walk Drive Charlotte North Carolina, 28216 was listed as her return address. On June 16 2022, First Star Logistics filed the instant suit against Cuthbertson and attempted to serve her at 6800 Dunmurry Lane Charlotte North Carolina 28217. Counsel for First Star identified 6800 Dunmurry as Cuthbertson's address via a Westlaw public records search.[1]

Two weeks prior to First Star filing the instant suit, however, Cuthbertson was deposed in the North Carolina suit. There, she stated that she lived in North Carolina while working for First Star, but had moved to Savannah Georgia in December of 2021. It does not appear she stated her residential address in North Carolina or Georgia during the deposition. In her affidavit supporting the current motion, Cuthbertson demonstrated she provided 9619 Chastain as her address to First Star and that First Star previously sent

---

[1] First Star stated in its response memoranda that First Star also had 6800 Dunmurry on file as an address for Cuthbertson, but the Court finds nothing in the record to support that contention.



at least one check to her at that address as far back as 2020. Cuthbertson further stated in her affidavit she moved to 627 Stonebridge Circle Savannah Georgia, 31419 in December of 2021 but still visited family at 9619 Chastain.

At times before and after default judgment was granted in this action, there was contact between counsel for First Star, Cuthbertson's counsel in the North Carolina action, Cuthbertson herself, and Cuthbertson's counsel in this action. There was much wrangling about Cuthbertson's address during this time, and it appears that Cuthbertson's address at 627 Stonebridge in Savannah Georgia was not known to First Star and its counsel until October of 2022. Yet, as recently as December of 2022, Cuthbertson was filing items in the North Carolina case with 9619 Chastain again listed as her return address.

After obtaining default judgment[2] against Cuthbertson in the instant suit via service at the 6800 Dunmurry address, First Star Logistics filed a notice of foreign judgment and served it at the 6800 Dunmurry and 9619 Chastain addresses. Monty Clark, the process server for 6800 Dunmurry, served the notice on an Aria Monds on October 27, 2022. Monds claimed to be the mother of Cuthbertson and stated Cuthbertson "stays [here] from time to time." In her affidavit, Cuthbertson acknowledged her parents do live at 6800 Dunmurry, but she claimed she has "not resided [there] in years."

The Supreme Court of Ohio held long ago:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.
>
> So long as service is "reasonably calculated" to reach interested parties, then the service is constitutionally sound. Accordingly, it is not necessary that service be attempted through the most likely means of success --

---

[2] The Default Judgment order was entered on September 22, 2022.

2

> ordinarily residence service; it is sufficient that the method adopted be "reasonably calculated" to reach its intended recipient.

<u>Akron-Canton Regional Airport Auth. v. Swinehart</u>, 62 Ohio St.2d 403, 406, 406 N.E.2d 811 (1980) (citing <u>In re Foreclosure of Liens for Delinquent Taxes</u>, 62 Ohio St.2d 333, 337, 405 N.E.2d 1030 (1980)). In the case of <u>In re Forclosure</u>, the Supreme Court stated:

> In situations where a taxpayer supplies officials with an address, it may be fairly presumed that the taxpayer can be reached at such address. Where as here, however, the official, i.e., treasurer, had actual knowledge of a different, and, indeed, a changed, residence address . . . we cannot say that notice would be "reasonably calculated" to reach the taxpayer when mailed to the older residence now used as investment property.

<u>In re Foreclosure</u>, 62 Ohio St.2d at 337-338.

Here, as Cuthbertson herself acknowledged, 6800 Dunmurry was, at least at some point, a residence of hers, and it is still occupied by her parents who themselves said to a process server that Cuthbertson stayed there from time to time. This explains why the address may appear on a public records search as her address. However, Cuthbertson provided the 9619 Chastain address to First Star and its representatives on multiple occasions over the years and stated in a deposition before the filing of this suit that she resided in another state entirely. It does not appear the 6800 Dunmurry address was ever provided during the North Carolina suit or was known to First Star outside of the public records search. As a result, the Court finds that, under all of the circumstances of this case, service at 6800 Dunmurry lane was not reasonably calculated to reach her.[3]

That being said, service on Cuthbertson at 6800 Dunmurry does not rise to the level of a "willful violation" of Rule 11 by First Star and its counsel. As the facts above

---

[3] First Star cites to <u>Stephens v. Jacobs</u>, 1996 Ohio App. LEXIS 931 (1st Dist.) to support its argument that service on a defendant's former residence where the defendant's parents still live can be found to be "reasonably calculated" to give a defendant notice. While the First District Court of Appeals did find that to be the case, the Court finds <u>Stephens</u> distinguishable from this case where, as in <u>In re Foreclosure</u>, there were additional circumstances which indicated a changed residential address. The Court also notes that in <u>Stephens</u> the defendant's parents acknowledged they "periodically retrieve[d]" the defendant's mail. <u>Id.</u> at *3. Similar facts are not presented here.

3

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| **FIRST STAR LOGISTICS, LLC** | * | **Case No. A 2202185** |
| | * | |
| **Plaintiff,** | * | **Judge Robert A. Goering** |
| | * | |
| **v.** | * | **NOTICE OF PROOF OF SERVICE BY** |
| | * | **PROCESS SERVER** |
| **ERICA CUTHBERTSON** | * | |
| | * | |
| **Defendant.** | * | |

Plaintiff, First Star Logistics, LLC, by and through counsel, gives notice that on **February 15, 2023**, a copy of the Complaint (with exhibits) filed on June 16, 2022 and Summons issued on February 9, 2023, were served on Defendant, Erica Cuthbertson, at 9619 Chastain Walk Drive, Charlotte, North Carolina 28216 ("9619 Chastain") by process server, Greentree Legal, LLC, by delivering a true and accurate copy of the Complaint and Summons to Ms. Cuthbertson's co-resident at 9619 Chastain, who confirmed that Ms. Cuthbertson also resides at 9619 Chastain Walk Drive.  A true and accurate copy of the process server's Return of Service is attached as ***Exhibit A***.

Respectfully submitted,

*/s/ Simon Y. Svirnovskiy*

Simon Y. Svirnovskiy (0097096)
J. Maxwell Williams (0099007)
FROST BROWN TODD LLP
3300 Great American Tower
301 East Fourth Street Cincinnati, Ohio 45202
Phone: (513) 651-6800
Facsimile: (513) 651-6981
ssvirnovskiy@fbtlaw.com
mwilliams@fbtlaw.com
*Attorneys for Plaintiff First Star Logistics, LLC*

## GZJ KDKV'G

## CERTIFICATE OF SERVICE

I certify that on this 21st day of February, 2023, the foregoing *Notice* was served by electronic

mail upon the following:

**Stephen E. Imm, Esq.**
**Jessica D. Gibson, Esq.**
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, OH 45245
stephen@finneylawfirm.com
jdg@finneylawfirm.com
*Attorneys for Defendant Erica Cuthbertson*

/s/ *Simon Y. Svirnovskiy*
Simon Y. Svirnovskiy (0097096)

0130771.0750160  4855-3697-2370v1

2

Exhibit "A"

## RETURN OF SERVICE

**State of Ohio**          **County of Hamilton**          **Common Pleas Court**

Case Number: A 2202185

Plaintiff:
**First Star Logistics, LLC**

vs.

Defendant:
**Erica Cuthbertson**

For:
Charles B. Galvin
FROST BROWN TODD LLC
9277 Centre Pointe Dr
Suite 300
West Chester, OH 45069

Received by Greentree Legal on the 10th day of February, 2023 at 8:43 am to be served on **Erica Cuthberston, 9619 Chastain Walk Drive, Charlotte, NC 28216**.

I, Kim Church, do hereby affirm that on the **15th day of February, 2023** at **8:00 pm, I:**

**SUBSTITUTE** served by delivering a true copy of the **Summons, Complaint, Exhibits** to: **Jay (Name not provided)** as **Co-resident** at the address of: **9619 Chastain Walk Drive, Charlotte, NC 28216**, the within named person's usual place of **Abode**, who resides therein, who is sixteen (16) years of age or older and informed said person of the contents therein, in compliance with state statutes.

**Additional Information pertaining to this Service:**
Co-resident confirmed residency.

I certify that I am over the age of 18, have no interest in the above action, and am in good standing in the judicial circuit in which the process was served.

Kim Church
Process Server

**Greentree Legal**
**10925 Reed Hartman Highway**
**Suite 300**
**Cincinnati, OH 45242**
**(513) 891-8600**

Our Job Serial Number: GRT-2023001629
Ref: 0750160

Copyright © 1992-2023 DreamBuilt Software, Inc. - Process Server's Toolbox V8.2m

**IN THE COURT OF COMMON PLEAS**
**HAMILTON COUNTY, OHIO**

| | | |
|---|---|---|
| **FIRST STAR LOGISTICS, LLC** | : | |
| | : | **CASE NO. A 2202185** |
| **PLAINTIFF,** | : | |
| | : | **JUDGE ROBERT GOERING** |
| **v.** | : | |
| | : | |
| | : | |
| **ERICA CUTHBERTSON,** | : | |
| | : | |
| **DEFENDANT.** | : | **ANSWER TO PLAINTIFF FIRST** |
| | : | **STAR LOGISTICS, LLC'S** |
| | : | **COMPLAINT** |
| | : | |

Now comes Defendant Erica Cuthbertson ("Defendant" or "Ms. Cuthbertson") by and through undersigned counsel, for her Answer to Plaintiff First Star Logistics, LLC's ("Plaintiff or First Star") Complaint (the "Complaint") hereby states as follows:

<u>**ANSWER**</u>
**FIRST DEFENSE**

1. In response to the allegations contained in Paragraph 1 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. Defendant denies the remaining allegations contained in Paragraph 1 of the Complaint.

2. In response to the allegations contained in Paragraph 2 of the Complaint, Defendant states that she was a salaried employee of QFS Transportation, LLC ("QFS") where she recruited agents for QFS. Defendant was later hired as an independent contractor by First Star for brokerage services. Exhibit 1 and Exhibit 2 of the Complaint relate to Defendant's work as an independent contractor of First Star providing brokerage services, they are not related to her employment by QFS. Defendant further states that Exhibit 1 and Exhibit 2 speak for

# <u>EXHIBIT H</u>

themselves, as such no response is required. Except as expressly admitted herein, Defendant denies the allegations contained in Paragraph 2 of the Complaint.

3. In response to the allegations contained in Paragraph 3 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. Defendant denies the remaining allegations contained in Paragraph 3 of the Complaint.

4. In response to the allegations contained in Paragraph 4 of the Complaint, the Defendant admits that her employment with QFS ended on or about March 20, 2020. Except as expressly admitted herein, Defendant denies the allegations contained in Paragraph 4 of the Complaint.

5. Defendant denies the allegations contained in Paragraph 5 of the Complaint.

6. Defendant denies the allegations contained in Paragraph 6 of the Complaint.

7. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 7 of the Complaint, and therefore denies the same.

8. Defendant denies the allegations contained in Paragraph 8 of the Complaint.

9. The allegations contained in Paragraph 9 of the Complaint purport to state one or more legal conclusions such that no response is required. To the extent that a response is required to Paragraph 9 of the Complaint, the Defendant denies the allegations contained in Paragraph 9 of the Complaint.

10. The allegations contained in Paragraph 10 of the Complaint purport to state one or more legal conclusions such that no response is required. To the extent that a response is required to Paragraph 10 of the Complaint, the Defendant denies the allegations contained in Paragraph 10 of the Complaint.

11. The allegations contained in Paragraph 11 of the Complaint purport to state one or more legal conclusions such that no response is required. Additionally, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. Defendant denies the remaining allegations contained in Paragraph 11 of the Complaint.

12. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 12 of the Complaint, and therefore Defendant denies the same.

13. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 13 of the Complaint, and therefore Defendant denies the same.

14. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 14 of the Complaint, and therefore Defendant denies the same.

15. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 15 of the Complaint, and therefore Defendant denies the same. Defendant states that she did not receive any business or referrals from First Star while she acted as a broker for First Star.

16. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 16 of the Complaint, and therefore Defendant denies the same.

17. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 17 of the Complaint, and therefore Defendant denies the same. Defendant states that she did not receive any customer lists, proprietary company processes, or other sensitive information from First Star.

18. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 18 of the Complaint, and therefore Defendant denies the same.

3

19. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 19 of the Complaint, and therefore Defendant denies the same.

20. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 20 of the Complaint, and therefore Defendant denies the same.

21. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 21 of the Complaint, and therefore Defendant denies the same.

22. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 22 of the Complaint, and therefore Defendant denies the same.

23. In response to the allegations contained in Paragraph 23 of the Complaint, the Defendant admits that her employment with QFS ended on or about March 20, 2020. Further, the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. Except as expressly admitted herein, Defendant denies the allegations contained in Paragraph 23 of the Complaint.

24. Defendant admits the allegations contained in Paragraph 24 of the Complaint.

25. In response to the allegations contained in Paragraph 25 of the Complaint, Defendant states that the documents attached to the complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required to the allegations contained in Paragraph 25 of the Complaint, Defendant denies the remaining allegations contained in Paragraph 25 of the Complaint.

26. In response to the allegations contained in Paragraph 26 of the Complaint, Defendant states that the documents attached to the complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 26 of the Complaint.

27. Defendant denies the allegations contained in Paragraph 27 of the Complaint.

28. Defendant denies the allegations contained in Paragraph 28 of the Complaint.

29. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 29 of the Complaint, and therefore Defendant denies the same.

30. In response to the allegations contained in Paragraph 30 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 30 of the Complaint.

31. In response to the allegations contained in Paragraph 31 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 31 of the Complaint.

32. In response to the allegations contained in Paragraph 32 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 32 of the Complaint.

33. In response to the allegations contained in Paragraph 33 of the Complaint, Defendant states that the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 33 of the Complaint.

34. Defendant is without knowledge to admit or deny the allegations contained in Paragraph 34 of the Complaint, and therefore Defendant denies the same.

35. In response to the allegations contained in Paragraph 35 of the Complaint, Defendant states that the documents attached to the complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. To the extent that a response is required, Defendant denies the remaining allegations contained in Paragraph 35 of the Complaint.

36. In response to the allegations contained in Paragraph 36 of the Complaint, the Defendant admits that her employment with QFS ended on or about March 20, 2020. Further, the documents attached to the Complaint as Exhibit 1 and Exhibit 2 speak for themselves, as such no response is required. Except as expressly admitted herein, Defendant denies the allegations contained in Paragraph 36 of the Complaint.

37. Defendant denies the allegations contained in Paragraph 37 of the Complaint.

38. Defendant denies the allegations contained in Paragraph 38 of the Complaint.

39. In response to the allegations contained in Paragraph 39 of the Complaint, Defendant incorporates by reference all admissions, denials, and statements set forth above as though fully set forth herein.

40. The allegations contained in Paragraph 40 of the Complaint purport to state one or more legal conclusions such that no response is required. To the extent a response is required, Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 40 of the Complaint, and therefore denies the same.

41. Defendant denies the allegations contained in Paragraph 41 of the Complaint.

42. Defendant denies the allegations contained in Paragraph 42 of the Complaint.

43. Defendant denies the allegations contained in Paragraph 43 of the Complaint.

44. Defendant denies the allegations contained in Paragraph 44 of the Complaint.

45. Defendant denies the allegations contained in Paragraph 45 of the Complaint.

## **AFFIRMATIVE DEFENSES**

46. The Complaint fails to state a claim upon which relief may be granted.

47. Plaintiff's right of recovery, if any, is barred by the equitable defenses of estoppel and waiver.

48. The Complaint is barred by the affirmative defenses of res judicata, collateral attack, statute of limitations, failure of consideration, the statute of frauds, and/or laches.

49. The Complaint is barred by the unclean hands of Plaintiff.

50. Plaintiff has failed to mitigate its damages, the existence of which is denied.

51. Plaintiff's claims are barred by its own breach of contract.

52. Plaintiff's claims are barred by lack of personal jurisdiction over Defendant, insufficiency of process, and insufficiency of service of process.

53. Defendant states the claims and damages in the Complaint were not the proximate and/or direct result of any action or inaction of the answering Defendant, and, therefore, Plaintiff is barred from recovery from Defendant.

54. Defendant hereby gives notice of her intent to rely on such additional affirmative defenses as are revealed through the course of discovery.

   **WHEREFORE**, Defendant requests that the Complaint be dismissed at Plaintiff's cost, judgment be entered in favor of the Defendant, and Defendant be awarded such other relief to which she may be entitled in equity or law as the Court may deem just and proper.

7

/s/ Stephen E. Imm

_____

Stephen E. Imm (0040068)
Jessica D. Gibson (0101403)
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd, Suite 225
Cincinnati, Ohio 45245
(513) 943-5678
(513) 943-6669-fax
stephen@finneylawfirm.com
*Attorney for Defendant*

8

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that a true and accurate copy of the foregoing was

served this 15th day of March 2023 via email upon the following:

Simon Y. Svirnovskiy
J. Maxwell Williams
FROST BROWN TODD LLC
3300 Great American Tower
301 E. Fourth St.
Cincinnati, Ohio 45202
ssvirnovskiy@fbtlaw.com
mwilliams@fbtlaw.com

Charles B. Galvin
FROST BROWN TODD LLC
9277 Centre Pointe Drive, Suite 300
West Chester, Ohio 45069
cgalvin@fbtlaw.com

*Attorneys for Plaintiff*

/s/ Stephen E. Imm
_____

Stephen E. Imm (0040068)