## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

FIRST STAR LOGISTICS, LLC,         Case No. 1:23-cv-152

       Plaintiff,        Judge Timothy S. Black

v.

ERICA CUTHBERTSON,

       Defendant.

## ORDER GRANTING PLAINTIFF' FIRST STAR'S
## UNOPPOSED MOTION FOR SUMMARY JUDGMENT,
## DISMISSING PLAINTIFF'S COMPLAINT

This civil case is before the Court upon Plaintiff's Motion for Summary Judgment (Doc. 19) and Plaintiff's Proposed Undisputed Facts (Doc. 20). Defendant has not responded to either of these pleadings, and the time for doing so has long since passed.

### OVERVIEW

Defendant Erica Cuthbertson ("Defendant") was an agent and freight broker, from August 29, 2018 to on or about March 20, 2020, for First Star Logistics, LLC ("First Star" or "Plaintiff"), a federally registered freight broker that provides third-party logistics services throughout the United States, First Star agreed to provide Defendant with access to its confidential and proprietary information, in exchange for Defendant agreeing to certain restrictive covenants that prohibited Defendant from competing with First Star. Defendant signed a Sales Agent Agreement (the "SAA") and a Non-Disclosure and Restrictive Covenant Agreement ("NDA") (referred to collectively the "Agreement") prohibiting her from using, outside her work for First Star, certain types of confidential

and proprietary information such as detailed customer lists, proprietary company processes and techniques, and other sensitive types of information. The term of the Sales Agent Agreement ran during the time of Defendant's association with First Star, and for a further period of 365 days following the termination of Sales Agent Agreement for any reason. However, Defendant admitted in sworn deposition testimony (in unrelated litigation) that shortly after her work started with First Star, and continuing after her separation from First Star to the present, she independently worked as a freight broker for several competitors of First Star in direct violation of the restrictions. Plaintiff seeks $110,000.00 in damages, plus costs, pre- and post- judgment interest, and $33,855.05 in attorney's fees.

## PROCEDURAL POSTURE

First Star sued Defendant in state court (Doc. 1). Defendant timely removed the case to this Court and timely filed her Answer (Doc. 4), represented by counsel. Judge Dlott of this Court denied First Star's motion to remand the case to state court (Doc. 9) and ordered that:

> "On or before 11/21/2023 at 5:00 p.m., Plaintiff's counsel shall send an email to Chambers, copying Mr. Imm, simply stating whether the parties intend to move forward with settling the case; otherwise the Court will rule on the two pending motions as reflected during the 11/20/23 conference."

After being advised that the parties were unable to reach a settlement, the Court resolved Defendant's motion to stay discovery (Doc. 15 ) and granted Defense counsel's motion to withdraw as counsel for Defendant, provided that he serve Defendant with a copy of the

Court's Order, along with copies of Plaintiff's discovery requests, and file a notice indicating when such service was complete, whereupon Mr. Imm would be terminated as counsel for Defendant. This occurred. (Doc. 16 ).

Moreover, the Court specifically warned Defendant that:

"Absent an agreement by the parties or further order by the Court, Defendant is put on notice that failure to timely respond may result in unfavorable actions, such as waiver of objections and requests for admission being deemed admitted. Fed. Rs. Civ. P. 33, 34, and 36."

On 05/24/2024, Plaintiff filed its Motion for Summary Judgment (Doc.19), including as Exhibit 7, a Supplement Pro Se Notice advising her that her failure to respond could result in judgment being entered against her. Plaintiff also contemporaneously filed its Statement of Undisputed Facts (Doc.20), per this Court' standing Order.

Defendant has failed to respond to Plaintiff's Statement of Undisputed Facts and has failed to respond to Plaintiff's Motion for Summary Judgment, and the time for doing has long passed.

## STANDARD OF REVIEW

Courts hold *pro se* pleadings "to less stringent standards than formal pleadings drafted by lawyers[.]" *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Thus, a "pro se document is to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Nevertheless, "the lenient treatment generally accorded to pro se litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Jourdan v. Jabe,* 951 F.2d

3

108, 110 (6th Cir. 1991)). **"Where, for example, a *pro se* litigant fails to comply with [] easily understood court-imposed [procedures], there is no basis for treating that party more generously than a represented litigant**." *Littlefield*, 92 F.3d at 416. (emphasis supplied).

As here, a motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When considering an unopposed motion for summary judgment, "a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014). This is because it is the moving party's "burden of establishing the nonexistence of a material factual dispute." *Id.* (quoting *Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir. 1979)). However, the Court may rely on the moving party's facts when a motion for summary judgment goes unopposed because "'[n]either the trial nor appellate court…will *sua sponte* comb the record from

4

the partisan perspective of an advocate for the non-moving party.'" *Id.* 630, n.11 (quoting *Guarino v. Brookfield Tp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992)).

The Sixth Circuit has explained that although a summary judgment motion is considered "unopposed" when no response is filed, "[t]his d[oes] not, however, end the district court's analysis." *Nationwide*, 767 F.3d at 629-30 (6th Cir. 2014). Indeed, granting summary judgment simply because the motion is unopposed amounts to an abuse of the Court's discretion. *E.g., Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005); *Stough v. Mayville Cmty. Sch.,* 138 F.3d 612, 614 (6th Cir. 1998); *Carver v. Bunch,* 946 F.2d 451, 455 (6th Cir. 1991). Specifically, the Sixth Circuit has held:

> The court … "may not grant Plaintiff's unopposed motion for summary judgment without conducting its own, searching review." *E.M.A. Nationwide,* 2013 WL 4545143, at *1. **Even where a party "offer[s] no timely response to [a] [ ] motion for summary judgment, the District Court [may] not use that as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)."** *Smith v. Hudson,* 600 F.2d 60, 65 (6th Cir. 1979).

This is so because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* at 64. Therefore, **even where a motion for summary judgment is unopposed, <u>a district court must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists</u>**. *Nationwide,* 767 F.3d at 630 (emphasis added).

5

Additionally, this Court's Standing Order Governing Civil Motions for Summary Judgment (available on the Court's website)[1] specifically requires the moving party to accompany its motion for summary judgment with a separately filed document entitled "Proposed Undisputed Facts," and further requires the opposing party to respond to each of the "Proposed Undisputed Facts" with either an admission or a denial. And the Court's Standing Order further specifies, in no uncertain terms, that: "**All material facts set forth in [the moving party's Proposed Undisputed Facts] will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with (A)(2) of this Standing Order**" (emphasis added).

## FINDINGS OF UNDISPUTED FACTS

Given Defendant's complete failure to respond to Defendant's Motion for Summary Judgment and/or Defendant's Statement of Undisputed Facts, and upon a careful review by this Court of Plaintiff's assertions of facts, the following facts are undisputed:

1. First Star is a federally registered freight broker that provides third-party logistics services throughout the United States. (Ex. 1, Affidavit of Alex Peralta, ¶4).

2. These services include intermodal marketing, international air and ocean transportation, domestic freight brokerage, warehousing, and a broad array of other transportation needs. (*Id.*).

3. First Star regularly partners with independent contractors to expand its logistics and freight network nationally to better serve its existing customers. (*Id.* at ¶5).

---

[1]Available at: www.ohsd.uscourts.gov/sites/ohsd/files/forms/standing%20order%20governing%20civil%20motions%20for%20summary%20judgment.pdf

4. To do so, First Star engages independent contractors throughout the United States to perform services for existing First Star customers in a local market and to develop additional business. (*Id.*).

5. These contractors, typically referred to as "agents," These contractors, typically referred to as "agents," operate under the First Star name and hold themselves out to the public and to customers as being part of First Star while providing services to existing First Star customers. (*Id.*).

6. First Star assists its agents in building their network and business in their geographical markets and often refers local business from First Star's customers to its agents within the region where the services are required. (*Id.* at ¶6). In other words, First Star regularly provides business to its agents. (*Id.*).

7. The third-party logistics industry (and the shipping industry at large) is extremely fragmented and competitive. (*Id.* at ¶7).

8. Developing and maintaining relationships with agents, customers, and carriers is critical to achieving and maintaining success in the industry. (*Id.*).

9. First Star grants its agents access to certain types of confidential and proprietary information such as detailed customer lists, proprietary company processes and techniques, and other sensitive types of information. (*Id.* at ¶8).

10. Access to confidential information is conditioned upon signing a Sales Agent Agreement (the "SAA") and a Non-Disclosure and Restrictive Covenant Agreement ("NDA", and with the SAA, referred to collectively the "Agreements." (*Id.*).

11. It is essential that First Star's agents have access to this information so that agents can provide services and develop business with existing First Star customers and other companies. (*Id.*).

12. First Star has spent substantial time, money, and other resources developing confidential and proprietary information, developing relationships with new customers, and strengthening relationships with its existing customers. (*Id.* at ¶9).

13. First Star has also expended significant resources (financial and otherwise) to develop its sales and marketing processes and training for its agents. (*Id.*).

14. First Star has taken several steps to protect its relationships with current and prospective customers and its confidential, proprietary, and trade secret information. (*Id.* at ¶10).

15. Specifically, First Star keeps secure password controls on all its proprietary information and restricts access to registered users who must be vetted and approved by First Star before receiving access. (*Id.*).

16. On August 29, 2018, Erica Cuthbertson ("Defendant") executed the SAA with First Star and began working as an independent contractor. (See Ex. 2, SAA).

17. The SAA had a one-year term, which automatically renewed for successive one year terms unless either party provided written notice of non-renewal at least thirty days prior to the end of the then-existing term. (*Id.* at Art. VI, § 6.1).

18. Under the SAA, Defendant's role and responsibilities with First Star differed from her role and responsibilities as an employee—in that she developed business brokering freight and received commission as an independent contractor. (Ex. 1, at ¶11). By contrast, as a salaried employee, Defendant was responsible for recruiting agents for First Star's trucking division, QFS Transportation, LLC. (*Id.*).

19. Defendant received a portion of any commission generated by agents she recruited as an additional financial incentive. (*Id.*).

20. Once Defendant executed the SAA, First Star provided Defendant (as an agent) with access to confidential and proprietary information of First Star including access to existing and prospective customer lists (including preferred points of contact and other customer-specific information), sales processes, sales history, and procedures. (*Id.* at ¶12).

21. In addition, First Star paid for and provided a litany of services to Defendant and spent additional and excessive sums on other items for Defendant's business. (*Id.*).

22. These charges were essential for Defendant to successfully operate as a First Star agent and broker freight. (*Id.*).

23. All charges were communicated to Defendant as First Star accrued them. (*Id.*).

24. The SAA provides necessary confidentiality, non-solicitation, and non-competition protections so that First Star can protect its investment and freely share confidential information with its agents. (Ex. 2, at Exhibit A to Exhibit 2, Agreement Regarding Confidentiality, NonSolicitation and Non-Recruitment).

25. Specifically, the SAA states: "[Defendant] agrees that during the term of the Sales Agent Agreement, and for a period of 365 days following the termination of Sales Agent Agreement for any reason, [Defendant] (including [her] owners, employees, officers, directors, and representatives) will not, directly or indirectly, either individually or as a

8

principal, partner, agent, consultant, contractor, employees, or as a director or officer of any corporation or association, or in any other manner or capacity whatsoever, except on behalf of [First Star], solicit business, or attempt to solicit business, in products or services competitive with products or services sold by [First Star], from any Customer of [First Star]." (Ex. 2, at Exhibit A to Exhibit 2, § B(1)).

26. Defendant also agreed not to disclose any of First Star's confidential information and agreed that she would "take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and agrees to immediately notify [First Star] if there is any unauthorized use or disclosure of the Confidential Information." (*Id.* at § A(3)).

27. The SAA also provided that Defendant would indemnify First Star for "all losses, damages, or expenses of whatever form or nature, including attorney's fees and other costs of legal defense" that resulted from Defendant "(i) breaching any provision of this Agreement, (ii) making representations or statements not specifically authorized by [First Star] herein or otherwise in writing, (iii) marketing, selling, or providing Services to customers other than as expressly authorized in this Agreement, (iv) violating any applicable law, rule, regulation, ordinance or order, or (v) any other negligent acts or omissions or contractual breaches." (*Id.*, at § 5.1(a)).

28. Similarly, on November 12, 2018, Defendant executed a Non-Disclosure and Restrictive Covenant Agreement ("NDA") (Doc 19 at Ex. 3).

29. The NDA states: "[Defendant] covenants and agrees that during the term of this Agreement and for a period of two (2) years after termination of this Agreement for any reason, that, without the express prior written permission of [First Star], [Defendant] will not directly or indirectly, either as principal, agent, employee, stockholder or co-partner or in any other individual or representative capacity, or in any relation whatsoever: (i) Solicit, divert or take away or attempt to solicit, divert or take away, any of the Customers, Prospective Customers, agents, brokers, carriers, or employees of [First Star]; (ii) Attempt to seek or cause any Customers, agents, brokers, carriers, or employees of [First Star] to refrain from continuing their relationship with [First Star]; (iii) Knowingly solicit employment from, or a contractual relationship with, [First Star's] agents, brokers, carriers, or employees; or (iv) Be employed by, perform services for, or receive compensation from, any individual or entity who competes with [First Star]." (*Id.* at § 6).

30. Defendant's employment with First Star ended on or about March 20, 2020. (Ex. 1, at ¶13).

31. In June of 2022, First Star discovered through Defendant's sworn deposition testimony (in a separate litigation) that Defendant worked as a broker for Solvent Logistics, a competing freight brokerage, for a period of two weeks in June of 2021,

where she earned $750. (Id. at ¶14; Ex. 4, Deposition of Erica Cuthbertson, p. 36: 5-15, p. 38: 1-4).

32. Defendant further admitted to working as an independent freight broker for several of First Star's competitors, including National Drayage Services, Evans Transportation Services, Freedom 1, LLC, U.S. Logistics, LLC, and Averitt Express, Inc. (Ex. 1, at ¶15; Ex. 4, at p. 39: 1- 6).

34. On average, Defendant earned $2,000 per week from these business relationships with First Star's competitors. (Ex. 1, at ¶16; Ex. 4, at p. 39: 17-20).

35. She admitted in her deposition testimony that she received these earnings as an independent freight broker, which in the intermodal transportation industry means her earnings took the form of commissions. (*Id.*).

36. In the intermodal transportation industry, brokers typically receive 60% to 70% of gross profits generated for their respective companies. (Ex. 1, at ¶17).

37. 80% is extraordinarily high. (*Id.*).

38. However, even assuming Defendant received an 80% commission rate (resulting in commission payments of $2,000 per week), the companies she worked for received $2,500 per week in gross profits from her breaches of the Agreements. (Id.).

39. Defendant further testified that she has "worked consistently as an independent freight broker since September of 2021," which indicates that she has worked at least 44 consecutive weeks in violation of the Agreements. (Ex. 1, at ¶18; Ex. 4, at p. 38-39).

40. Multiplying the 44 weeks Defendant worked in violation of the Agreements by the anticipated $2,500 per week (at a minimum) First Star's competitors benefited from her work, this equates to total gross profits wrongfully earned by First Star's competitors of $110,000.00. (Ex. 1, at ¶19).

41. Defendant agreed that First Star could pursue claims for any attorney's fees and costs incurred in enforcing its rights under the Agreements. (*Id.*, at ¶20).

42. Defendant owes First Star at least $110,000.00 under the Agreements related to various prepaid expenses and damages resulting from Defendant's breaches of the Agreements plus costs, pre- and post- judgment interest, and $33,855.05 in attorney's fees. (*Id.*, at ¶21; *see also* Ex. 6).

43. Defendant's employment with First Star ended on or about March 20, 2020. First Star discovered through Defendant's sworn deposition testimony (in separate litigation) that

10

Defendant worked for a competing freight brokerage as early as June of 2021. Defendant also admitted to consistently working as an independent freight broker since September of 2021 and diverting business to numerous First Star competitors.

44. Defendant directly violated the Agreements by competing with First Star and using her knowledge of First Star's confidential and proprietary information to divert customers and other business away from First Star to First Star's competitors.

## CONCLUSIONS OF LAW

First Star is entitled to judgment as a matter of law because there is no genuine issue of material fact as to whether Defendant breached the Agreements with First Star, and First Star evidences actual and verified damages from the breach, and First Star abided by the Agreements. First Star satisfies the elements of breach of contract.

A breach of contract claim consists of the following four elements: "(1) the existence of a contract, (2) that the [complainant] fulfilled its contractual obligations, (3) that the [defending party] failed to fulfill its contractual obligations, and (4) that the plaintiff incurred damages as a result." *Lamar Advantage GP Co. v. Patel*, 12th Dist. Warren No. CA 2011-10-105, 2012-Ohio3319, ¶ 25; *Amicus Miami of Ohio, LLC v. Kacachos*, 2022 WL 4473465, *2 (S.D. Ohio 2022).

As the Agreements state that Ohio law governs and the forum is in Ohio, Ohio law applies to the matter. *Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 560 (6th Cir. 2016).

This Court and the Supreme Court of Ohio have long held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to

11

the public." *QFS Transportation, LLC v. Huguely*, 2022 WL 395756, *4 (S.D. Ohio 2022) (quoting *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 26, 325 N.E.2d 544 (1975)).

These restrictive covenants satisfy each of the nine factors described by the First District in *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 270 747 N.E.2d 268 (1st Dist. 2000). Thus, there is no genuine dispute that the Agreements are valid, enforceable, and binding contracts.

Defendant breached the Agreements. Indeed, Defendant admitted to breaching the Agreements in toto in her deposition testimony. (Ex. 3, p. 38: 20-25; p. 29: p. 39: 1-4).

Additionally, First Star fully performed its covenants in the Agreements. It employed Defendant and provided her with extensive skills and knowledge of the industry, as well as access to its confidential customer lists and strategies. Defendant was also provided commissions for her work at First Star.

Under Ohio law, gains realized through improper competition may be disgorged as a measure of damages. *Try Hours, Inc. v. Swartz*, 6th Dist. No. L-06-1077, 2007-Ohio-1328 (March 23, 2007) (citing *Wiebold Studio, Inc. v. Old World Restorations, Inc.,* 19 Ohio App.3d 246, 448 N.E.2d 280 (1st Dist. 1985)); R.C. 1333.63(A) (damages may include the unjust enrichment caused by misappropriation); *Miller Medical Sales, Inc. v. Worstell*, 10th Dist. No. 93-AP-23 (Dec. 21, 1993) (plaintiff was awarded damages in an amount equal to gross profits received by a competitor while a former employee was breaching a non-competition agreement); *American Logistics Group, Inc. v. Weinpert*, 8th Dist. No. 85041, 2005-Ohio-4809, 2005 WL 2240987 (Sep. 15, 2005) (trial court did not err in calculating lost profits by subtracting the former employee's salary, which would

12

have been the company's cost in generating the extra revenue, from the amount a competitor netted in profits while breaching the non-competition agreement); and *Cleveland Cotton Products v. James*, 8th Dist. No. 70051, 1996 WL 631079 (Oct. 31, 1996) (lost profits calculated by subtracting plaintiff's normal costs from a competitor's gross sales generated while breaching the non-competition agreement).

First Star has suffered harm and continues to suffer harm due to the unfair competitive advantage granted to First Star's competitors through Defendant's action. This loss of goodwill and fair competition has caused irreparable harm to First Star's business and its relationship to its customers. Moreover, the misuse of customer contacts, pricing information, strategies, and other confidential and proprietary information has caused severe harm that should be considered when calculating damages.

Defendant owes First Star at least $110,000.00 under the Agreements related to various prepaid expenses and damages resulting from Defendant's breaches of the Agreements, plus costs, and post-judgment interest, and $33,855.05 in attorney's fees.

## CONCLUSION

There is no genuine dispute as to the material facts at issue in this case. Defendant intentionally violated reasonable and enforceable Agreements that First Star uses to protect its legitimate business interests, confidential and proprietary information, and other sensitive information. Therefore, for the reasons set forth in this Order, First Star's motion for summary judgment is **GRANTED**.

The Clerk shall enter a final Judgment for First Star Logistics, LLC and against Erica Cuthbertson for $143,855.05, plus costs, plus interest at the lawful rate from the date of this Order until paid, whereupon **this case is CLOSED.**

**IT IS SO ORDERED.**

Date: ___1/10/2025_____                    ___*s/Timothy S. Black*_____
                                                 Timothy S. Black
                                                 United States District Judge